**MCGEARY CUKOR LLC**
Michael Cukor, Esq.
mcukor@mcgearycukor.com
Vincent McGeary
vmcgeary@mcgearycukor.com
7 Dumont Place
Morristown, NJ 07960
(973) 339-7367
Attorneys for Plaintiff

**CULPEPPER IP, LLLC**
Kerry S. Culpepper,
kculpepper@culpepperip.com
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawaii 96740
Telephone:(808) 464-4047
Facsimile: (202) 204-5181
Pro Hac Vice Counsel for Plaintiffs

**Deleted:** Pro Hac Vice forthcoming

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

AFTER II MOVIE, LLC,
BODYGUARD PRODUCTIONS, INC.,
HITMAN TWO PRODUCTIONS, INC.
KILLING LINK DISTRIBUTION, LLC,
LHF PRODUCTIONS, INC.,
MILLENNIUM FUNDING, INC.,
MILLENNIUM IP, INC.,
MILLENNIUM MEDIA, INC.,
MON, LLC,
NIKOLA PRODUCTIONS, INC.,
OUTPOST PRODUCTIONS, INC.,
RAMBO V PRODUCTIONS, INC.,
VENICE PI, LLC,
VOLTAGE HOLDINGS, LLC, and
WONDER ONE, LLC,

          Plaintiffs,

v.

RCN TELECOM SERVICES, LLC; and
RCN TELECOM SERVICES OF

Case No. 3:21-cv-15310-FLW-TJB

FIRST AMENDED COMPLAINT
FOR
COPYRIGHTINFRINGEMENT AND
DEMAND
    FOR JURY TRIAL

**Deleted:** ¶

**Deleted:** SF FILMS, LLC,¶

**Deleted:** and¶
YAR PRODUCTIONS, INC.

MASSACHUSETTS, LLC,

    Defendants.

Plaintiffs AFTER II MOVIE, LLC, BODYGUARD PRODUCTIONS, INC., HITMAN TWO PRODUCTIONS, INC., KILLING LINK DISTRIBUTION, LLC, LHF PRODUCTIONS, INC., MILLENNIUM FUNDING, INC., MILLENNIUM IP, INC., MILLENNIUM MEDIA, INC., MON, LLC, NIKOLA PRODUCTIONS, INC., OUTPOST PRODUCTIONS, INC., RAMBO V PRODUCTIONS, INC., VENICE PI, LLC, VOLTAGE HOLDINGS, LLC, and WONDER ONE, LLC, ("Plaintiffs") file this First Amended Complaint against Defendants RCN TELECOM SERVICES, LLC and RCN TELECOM SERVICES OF MASSACHUSETTS, LLC ("Defendants") and allege as follows:

**Nature of the Action and Personal Jurisdiction**

1.  This matter arises under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101, et seq. (the "Copyright Act").

2.  The Plaintiffs allege that Defendants are liable for injunctive relief pursuant to 17 U.S.C. § 512(j), secondarily liable (under material contribution and vicarious infringement) for direct copyright infringements in violation of 17 U.S.C. §§ 106 and 501 and violations of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202.

3.  Defendants solicit, transact, and/or do business within this jurisdiction, and have committed unlawful and tortious acts both within and outside this jurisdiction with the full knowledge that their acts would cause injury in this jurisdiction.  As such, Defendants have sufficient contacts with this judicial district to permit the Court's exercise of personal jurisdiction over them.

**Deleted:** SF FILMS, LLC,

**Deleted:** , and YAR PRODUCTIONS, INC.

**Deleted:** and

4.   Upon information and belief, Defendant RCN TELECOM SERVICES, LLC is a limited liability company organized under the laws of Delaware and has its principal office at Princeton, New Jersey.

5.   Upon information and belief, Defendant RCN TELECOM SERVICES OF MASSACHUSETTS, LLC is a limited liability company organized under the laws of Delaware and has its principal office at Arlington, MA.

**Parties**

6.   The Plaintiffs are owners of the copyrights for the motion pictures ("Works"), respectively, as shown in Exhibit "A".

7.   Plaintiffs are producers of popular motion pictures currently available for sale online and in brick and mortar retail stores. Many of these critically acclaimed motion pictures were released in theaters throughout the world and feature A-list actors such as Samuel Jackson, Ryan Reynolds, Sylvester Stallone, Nicholas Cage, Angela Basset, Gerard Butler, Gary Oldman, Common, Linda Cardellini, Milla Jovovich, Pierce Brosnan, Dylan McDermott, Woody Harrelson, James Marsden and Rob Reiner, among others.

8.   Plaintiffs invested significant financial resources, time and effort in making and marketing these motion pictures based upon the expectation that they would have an opportunity to get a return on their investment from rentals and sales. Massive piracy of these motion pictures on the Internet via peer-to-peer networks by subscribers of Internet Service Providers ("ISPs") such as Defendants and the willful failure of the ISPs to deal with this issue despite clear notice of it have hindered this opportunity.

9.   AFTER MOVIE II, LLC is a Nevada limited liability company with its principal place of business at Las Vegas, NV.

3

10. BODYGUARD PRODUCTIONS, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

11. HITMAN TWO PRODUCTIONS, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

12. KILLING LINK DISTRIBUTION, LLC is a California limited liability company with its principal place of business at Beverly Hills, CA.

13. LHF PRODUCTIONS, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

14. MILLENNIUM FUNDING, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

15. MILLENNIUM IP, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

16. MILLENNIUM MEDIA, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada.

17. MON, LLC is a California limited liability company with its principal place of business at Beverly Hills, CA.

18. NIKOLA PRODUCTIONS, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

19. OUTPOST PRODUCTIONS, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

20. RAMBO V PRODUCTIONS, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

21. VENICE PI, LLC is a California limited liability company with its principal place of business at Los Angeles, CA.

22. VOLTAGE HOLDINGS, LLC is a limited liability company registered under the laws of the State of Nevada, has principal offices in Los Angeles, California and is an affiliate of Voltage Pictures.

23. WONDER ONE, LLC is a Wyoming limited liability company with its principal place of business at Sherman Oaks, CA.

24. Defendant RCN TELECOM SERVICES, LLC is a limited liability company organized under the laws of Delaware with its principal office at Princeton, New Jersey.

25. Defendant RCN TELECOM SERVICES OF MASSACHUSETTS, LLC is, upon information and belief, a limited liability company organized under the laws of an Delaware with its principal place of operation in Princeton, New Jersey.

26. Non-party RCN CORP. is, upon information and belief, a now defunct corporation previously organized under the laws of Delaware, but whose name is still used by RCN TELECOM SERVICES, LLC.

27. Upon information and belief, the Defendant RCN TELECOM SERVICES, LLC, non-party RCN CORP. and Defendant RCN TELECOM SERVICES OF MASSACHUSETTS, LLC are operated as a single, integrated company, under the RCN brand, with common management in New Jersey, a common corporate headquarters in New Jersey, and common policies and practices with respect to the provision of internet services.

28. Defendants are members of the American Registry of Internet Numbers ("ARIN"), which is a nonprofit, member-based organization that manages and distributes Internet number resources such as

5

**Deleted:** <#>SF Films, LLC is a New York limited liability company with its principal place of business in New York, New York and is an affiliate of Voltage Pictures.¶

**Deleted:** <#>YAR Productions, Inc. is a corporation organized under the laws of the State of New York, has a principal place of business in New York and is an affiliate of Voltage Pictures.¶

Internet Protocol ("IP") addresses and Autonomous System Numbers.   *See* Exhibit "B".

29. Defendants have an ARIN "Org" kind handle of RTSL-6 with full name "RCN" and an address of 650 College Road East, Princeton, NJ, 08540 United States.

30. Defendants have an ARIN "Individual" kind handle of PJ301-ARIN with full name Peter Jacoby and address of 956 Massachusetts Ave., Arlington, MA 02476.

31. Defendants have an ARIN "Group" kind handle of RAD75-ARIN with full name "RCN Abuse Department", a physical address of 650 College Road East, Princeton, NJ, 08540 United States and an email address of "abuse@rcn.com".

32. Defendants have another ARIN "Group" kind handle of ZR40-ARIN with full name "RCN Corporation" and a physical address of 650 College Road East, Princeton, NJ, 08540 United States.

33. The ARIN records show that ARIN has directly allocated numerous IP address blocks to RCN, including 33 Networks and 11 Autonomous System Numbers.

34. Defendants are required to update the WHOIS records for the IP addresses it reassigns or reallocates to per its registration agreement with ARIN.

35. Defendant RCN TELECOM SERVICES OF MASSACHUSETTS, LLC is located at the address RCN publishes for its PJ301-ARIN individual handle.

36. Defendant RCN TELECOM SERVICES, LLC is located at the address RCN publishes for its ZR40-ARIN, RAD75-ARIN and RTSL-6 handles.

37. Defendant RCN TELECOM SERVICES, LLC designates Peter Jacoby as its designated DMCA agent, the same individual designated for RCN TELECOM SERVICES OF

MASSACHUSETTS, LLC.

38. Defendants operate as an Internet Service Provider that provides transmitting, routing, or connection for material through a system or network controlled or operated by or for Defendants.

39. Defendants advertise as one of the fastest ISPs.  *See* https://www.rcn.com/ [last accessed on July 21, 2021]; Decl. of Joshua Lee at ¶3.

40. Many of Defendants' subscribers are motivated to subscribe to RCN's service because it allows them to download movies and other copyrighted content—including unauthorized content—as efficiently as possible.

41. Accordingly, Defendants promote their service to download and upload large amounts of content for subscribers that "spend hours downloading music, streaming music and gaming". *See* Decl. of Joshua Lee at ¶4.

42. In exchange for this service, Defendants charge their subscribers monthly fees ranging in price based on the speed of service.

43. At all relevant times, Defendants knew that their subscribers routinely used their networks for illegally downloading and uploading copyrighted works, particularly Plaintiffs' Works. As described below, Plaintiffs' agent sent over 5,400 notices styled per 17 U.S.C. §512(c)(3) to Defendants' designated abuse contact informing Defendants that many of their subscribers were actively utilizing their service to infringe Plaintiffs' Works. Those notices gave Defendants the specific identities of the infringing subscribers, referred to by their Internet Protocol ("IP") addresses, port numbers and time of infringement (to the second) and included the file title of the infringing copy being pirated that included the altered copyright management information. Nonetheless, Defendants persistently turned a blind eye to the massive infringement of Plaintiffs'

7

Works occurring over their network. Defendants allowed the illegal activity because it was popular with subscribers and acted as a draw to attract and retain new and existing subscribers. Defendants' subscribers, in turn, purchased more bandwidth and continued using Defendants' services to infringe Plaintiffs' Works.

44. Defendants knew that if they terminated or otherwise prevented repeat infringer subscribers from using their service to infringe, or made it less attractive for such use, Defendants would enroll fewer new subscribers, lose existing subscribers, and ultimately lose revenue. For those account holders and subscribers who wanted to download files illegally at faster speeds, Defendants obliged them in exchange for higher rates. In other words, the greater the bandwidth their subscribers required for pirating content, the more money Defendants made.

## Joinder

45. Pursuant to Fed. R. Civ. P. 20(a)(1), each of the Plaintiffs are properly joined because, as set forth in detail above and below, the Plaintiffs assert: (a) a right to relief arising out of the same transaction, occurrence, or series or transactions, namely (i) the use of Defendants' services by their subscribers for infringing the copyrights in Plaintiffs' Works and (ii) the contribution to said copyright infringements by Defendants; and (b) that there are common questions of law and fact.

46. Pursuant to Fed. R. Civ. P. 20(a)(2), each of the Defendants are properly joined because, as set forth in more detail below, the Plaintiffs assert that the contributory infringements complained of herein by each of the Defendants: (a) arise out of the same transaction, occurrence, or series of transactions or occurrences, and (b) have common questions of law and fact.

47. Plaintiffs assert a right of relief against the Defendants jointly and severally.

## Subject Matter Jurisdiction and Venue

8

48. This Court has subject matter jurisdiction over this action pursuant to 17 U.S.C. §§ 101, et. seq., (the Copyright Act), 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1338 (patents, copyrights, trademarks, and unfair competition).

49. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) - (c) because: (a) all or a substantial part of the events or omissions giving rise to the claims occurred in this District; (b) the Defendants can or could be found, in this District; and/or (c) Defendants are subject to the court's personal jurisdiction with respect to the present action.  Additionally, venue is proper in this District pursuant 28 U.S.C. § 1400(a) (venue for copyright cases), because the Defendants or Defendants' agents reside and can be found in this District.

### Factual Background

**A) The Plaintiffs Own the Copyrights to the Works**

50. The Plaintiffs are the owner of the copyrights in the Works as shown in Exhibit "A" either through work for hire agreement, assignments and/or mergers.  The Works are the subjects of copyright registrations and this action is brought pursuant to 17 U.S.C. § 411.

51. The Works are motion pictures currently offered for sale in commerce.

52. Defendants had notice of Plaintiffs' rights through at least the credits indicated in the content of the motion pictures which bore proper copyright notices.

53. Defendants also had notice of Plaintiffs' rights through general publication and advertising associated with the motion pictures, and packaging and copies, each of which bore a proper copyright notice.

54. Defendants also had notice of Plaintiffs' rights through notices that were sent to Defendants' abuse contact.

55. Defendants also had notice of Plaintiffs' rights through a letter from Plaintiffs' counsel.

9

*See* Exhibit "D".

**B) Defendants' Subscribers Infringe Plaintiffs' Copyrights**

56. Defendants' subscribers use software such as BitTorrent to infringe Plaintiffs' exclusive rights of reproduction and distribution.

57. BitTorrent is one of the most common peer-to-peer file sharing protocols (in other words, set of computer rules) used for distributing large amounts of data.

58. The BitTorrent protocol's popularity stems from its ability to distribute a large file without creating a heavy load on the source computer and network. In short, to reduce the load on the source computer, rather than downloading a file from a single source computer (one computer directly connected to another), the BitTorrent protocol allows users to join a "swarm" of host computers to download and upload from each other simultaneously (one computer connected to numerous computers).

59. In a report from January 2011, a survey conducted by the firm Envisional estimated that 11.4 percent of all Internet traffic involved the unauthorized distribution of non-pornographic copyrighted content via BitTorrent. *See* Envisional, "Technical report: An Estimate of Infringing Use of the Internet", January 2011, https://www.ics.uci.edu/~sjordan/courses/ics11/case_studies/Envisional-Internet_Usage-Jan2011-4.pdf [last accessed July 21, 2021].

60. A more recent study by Sandvine determined that file-sharing accounts for 3 percent of global downstream and 22 percent of upstream traffic, with 97% of that traffic in turn being BitTorrent. *See* Sandvine, "The Global Internet Phenomena Report", October 2018, https://www.sandvine.com/hubfs/downloads/phenomena/2018-phenomena-report.pdf [last accessed on May 27, 2021].

61. BitTorrent is overwhelmingly used for piracy. See David Price, "NetNames Piracy Analysis: Sizing the Piracy Universe", September 2013, pg. 18, http://creativefuture.org/wp-content/uploads/2016/01/netnames-sizing_piracy_universe-FULLreport-sept2013.pdf [last accessed on Oct. 1, 2021] ("Of all unique visitors to bittorrent portals in January 2013, it is estimated that 96.28% sought infringing content during the month…")

**1) The Initial Seed, Torrent, Hash and Tracker**

62. A BitTorrent user that wants to upload the new file, known as an "initial seeder," starts by creating a "torrent" descriptor file using, for example, the Client he or she installed onto his or her computer.

63. The initial user or seeder of a file used a process referred to as "ripping" to create a copy of motion pictures from either Blu-ray or legal streaming services.

64. The initial seeder often modifies the file title of the Work to include a wording such as "FGT", "RARBG" or "YTS" in the title of the torrent files and file copies in order to enhance a reputation for the quality of his or her torrent files and attract users to his or her piracy website.

65. The Client takes the target computer file, the "initial seed," here the copyrighted Work, and divides it into identically sized groups of bits known as "pieces."

66. The Client then gives each one of the computer file's pieces, in this case, pieces of the copyrighted Works, a random and unique alphanumeric identifier known as a "hash" and records these hash identifiers in the torrent file.

67. When another peer later receives a particular piece, the hash identifier for that piece is compared to the hash identifier recorded in the torrent file for that piece to test that the piece is error-free. In this way, the hash identifier works like an electronic fingerprint to identify the source and origin of the piece and that the piece is authentic and uncorrupted.

11

68. Torrent files also have an "announce" section, which specifies the URL (Uniform Resource Locator) of a "tracker," and an "info" section, containing (suggested) names for the files, their lengths, the piece length used, and the hash identifier for each piece, all of which are used by Clients on peer computers to verify the integrity of the data they receive.

69. The "tracker" is a computer or set of computers that a torrent file specifies and to which the torrent file provides peers with the URL address(es).

70. The tracker computer or computers direct a peer user's computer to other peer user's computers that have particular pieces of the file, here the copyrighted Work, on them and facilitates the exchange of data among the computers.

71. Depending on the BitTorrent Client, a tracker can either be a dedicated computer (centralized tracking) or each peer can act as a tracker (decentralized tracking.)

**2) Torrent Sites**

72. "Torrent sites" are websites that index torrent files that are currently being made available for copying and distribution by people using the BitTorrent protocol.  There are numerous torrent websites including the notorious YTS, The Pirate Bay and RARBG websites.  These websites were noted by the Office of the United States Trade Representative ("USTR") as examples of Notorious Markets defined as an online marketplace reportedly engaged in and facilitating substantial piracy. *See* USTR, 2014 Out-of-Cycle Review of Notorious Markets, Mar. 5, 2015, pg. 17, Available at https://ustr.gov/sites/default/files/2014%20Notorious%20Markets%20List%20-%20Published_0.pdf [last accessed on May 7, 2021]; *see also* USTR, 2018 Out-of-Cycle Review of Notorious Markets, April 2019, pgs. 24, 27-28, Available at https://ustr.gov/sites/default/files/2018_Notorious_Markets_List.pdf [accessed on May 7, 2021].

3) **Defendants' subscribers access torrent sites from IP addresses provided by Defendants**

73. Defendants' subscribers accessed torrent sites including the YTS website to upload and download Plaintiffs' copyrighted Work from IP addresses provided by Defendants.

74. For example, an individual using email address j65*****@gmail.com accessed the torrent website YTS from IP address 207.237.11.70 assigned by Defendants to their subscriber and downloaded torrent files for the Works *Rambo V: Last Blood*. *See* Exhibit "C" at pg. 2.

4) **Uploading and Downloading a Work Through a BitTorrent Swarm**

75. Once the initial seeder has created a torrent and uploaded it onto one or more torrent sites, then other peers begin to download and upload the computer file to which the torrent is linked (here the copyrighted Work) using the BitTorrent protocol and BitTorrent Client that the peers installed on their computers.

76. The BitTorrent protocol causes the initial seeder's computer to send different pieces of the computer file, here the copyrighted Work, to the peers seeking to download the computer file. Defendants transmit the pieces to the peers.

77. Once a peer receives a piece of the computer file, here a piece of the copyrighted Work, it starts transmitting that piece to the other peers. Defendants transmit the pieces to the peers.

78. In this way, all of the peers and seeders are working together in what is called a "swarm."

79. Here, the Defendants' subscribers participated in a swarm and directly interacted and communicated with other members of the swarm through digital handshakes, the passing along of computer instructions, uploading and downloading, and by other types of transmissions, Plaintiffs' Works.

80. Defendants distributed the subscribers' transmissions to other members of the swarm.

81. In this way, and by way of example only, one initial seeder can create a torrent that breaks a movie up into hundreds or thousands of pieces saved in the form of a computer file, like the Works here, upload the torrent onto a torrent site, and deliver a different piece of the copyrighted Work to each of the peers. The recipient peers then automatically begin delivering the piece they just received to the other peers in the same swarm.

82. Once a peer has downloaded the full file, the BitTorrent Client reassembles the pieces and the peer is able to view the movie. Also, once a peer has downloaded the full file, that peer becomes known as "an additional seed," because it continues to distribute the torrent file, here the copyrighted Work.

**5) Plaintiffs' computer investigator identified Defendants' IP addresses as participants in swarms that were distributing Plaintiffs' copyrighted Works**

83. The Plaintiffs engaged Maverickeye UG ("MEU") to identify the IP addresses that are being used by those people that are using the BitTorrent protocol and the Internet to reproduce, distribute, display or perform Plaintiffs' copyrighted Works.

84. MEU used forensic software to enable the scanning of peer-to-peer networks for the presence of infringing transactions.

85. MEU extracted the resulting data emanating from the investigation, reviewed the evidence logs, and isolated the transactions and the IP addresses associated therewith for the files identified by the SHA-1 hash value of the Unique Hash Number.

86. MEU logged information including the IP addresses, Unique Hash Numbers, and hit dates that show that Defendants' subscribers distributed pieces of the Plaintiffs' copyrighted Works identified by the Unique Hash Number.

87. Defendants' subscribers' computers used the identified IP addresses to connect to the

investigative server in order to transmit a full copy, or a portion thereof, of a digital media file identified by the Unique Hash Number.

88. MEU's agent analyzed each BitTorrent "piece" distributed by the IP addresses and verified that re-assemblage of the pieces using a BitTorrent Client results in a fully playable digital motion picture of the Works.

89. MEU's agent viewed the Works side-by-side with the digital media file that correlates to the Unique Hash Number and determined that they were identical, strikingly similar or substantially similar.

**C) The Operator of the YTS Website Confirmed that At Least One of Defendants' Subscribers' Accounts was Used to Download Torrent Files for Copying Copyright Protected Works from the YTS Website.**

90. The YTS website operator maintained records of activity of registered user accounts. *See* Exhibit "C" at pg. 3 (Certificate of Authenticity).

91. As shown in Exhibit "C", the records including the email address of the registered user account, the torrent files the registered account downloaded, the IP address from where the registered user accessed the YTS website, and the time.

**D) Defendants' Subscribers Distributed Copies of Plaintiffs' Works.**

92. Defendants' subscribers distributed at least pieces of each of Plaintiffs' Works over network connections provided by Defendants to other peers in the Swarm.

93. Defendants' subscriber at IP address 65.78.99.191 distributed hundreds of copies of Plaintiff Millennium Funding, Inc.'s Work *Angel Has Fallen* by the file name "Angel.has.fallen.2019.1080p-dual-lat-cinecalidad.is.mp4".

94. Defendants' subscriber at IP address 207.172.202.107 distributed hundreds of copies of

Plaintiff Millennium Funding Inc.'s Work *Hunter Killer* by the file name "[www.Torrent9.uno ] Hunter Killer 2018 FRENCH 720p WEB H264" and the Work *Angle Has Fallen* by the file name "[OxTorrent.com] Angel.Has.Fallen.2019. FRENCH.720p.WEB.H264-FRATERNiTY.mkv".

95. MEU confirmed over 800 instances of Defendants' subscriber at IP address 209.94.139.49 distributing copies of Plaintiff Rambo V Productions, Inc.'s Work *Rambo V: Last Blood* under the file name "[WWW.BLUDV.TV] Rambo - AtÃ© o Fim 2019 (720p - BluRay) [DUBLADO] Acesse o ORIGINAL WWW.BLUDV.TV" and over 700 instances of Defendants' subscriber at IP address 66.44.13.123 distributing the Work under the file name "Rambo.last.blood.2019.1080p-dual-lat-cinecalidad.is.mp4".

**E) Defendants' subscribers knew the Copyright Management Information included in the files they distributed to other peers had been removed or altered without the authority of Plaintiffs.**

96. A legitimate file copy of each of the Works includes copyright management information ("CMI") indicating the title.

97. The initial seeders of the infringing file copies of Plaintiffs' Works added wording to the file titles to "brand" the quality of piracy files he or she released and attract further traffic to his or her website.

98. For example, the initial seeder of the infringing file copies of the Works After We Collided and London Has Fallen added the wording "RARBG" to the file titles to brand the quality of piracy files he or she released and attract further traffic to the RARBG website.

16

99. The word RARBG is not included in the file title of legitimate copies or streams of the Works. The initial seeder of the Work altered the title to falsely include the words "RARBG" in the CMI.

100. The initial seeder of the infringing file copies of the Work Angel Has Fallen added the wording "YTS" to the file titles to brand the quality of piracy files he or she released and attract further traffic to the YTS website.

101. The word YTS is not included in the file title of legitimate copies or streams of the Works. The initial seeder of the Work altered the title to falsely include the words "YTS" in the CMI.

102. The file copies Defendants' subscribers distributed to other peers in the Swarm included the altered CMI in the file title.

103. Defendants' subscribers knew that the website or BitTorrent Client from which they obtained their torrent files was distributing illegal copies of the Work.

104. In many cases, Defendants' subscribers had registered accounts with these piracy websites.

105. Defendants' subscribers knew that the entity included in the false or altered CMI such as YTS or RARBG was not the author of Plaintiffs' Works.

106. Defendants' subscribers knew that the entity included in the false or altered CMI such as YTS or RARBG was not a licensed distributor of Plaintiffs' Works. Indeed, the YTS website includes a warning to this effect.

107. Defendants' subscribers knew that the false or altered CMI that included words such as YTS and RARBG in the file names was false.

17

**Formatted:** Font: Not Bold

108. Defendants' subscribers knew that the false or altered CMI in the titles would induce, enable, facility or conceal infringements of the Works when they distributed the false CMI, altered CMI or the Work including the false or altered CMI.

109. Namely, Defendants' subscribers knew that other recipients would see the file titles and use the altered CMI to go to the website such as YTS from where the torrent files originated to obtained unlicensed copies of the Work.

110. By providing the altered CMI to others, Defendants' subscribers induced, enabled and facilitated further infringements of the Work.

111. MEU determined that Defendants' subscribers distributed Plaintiffs' Works with altered CMI as shown, for example, in Exhibit "E".

112. MEU determined that Defendants' subscribers distributed over 200 different modified CMI with file copies of the Works.

**F) Defendants had Knowledge that Their Subscribers were Infringing Plaintiffs' Works and Distributing File Copies of the Works with altered CMI But Continued to Provide Service to Their Subscribers.**

113. Plaintiffs engaged MEU to generate Notices of infringements ("Notices") styled per 17 U.S.C. §512©(3) of the Digital Millennium Copyright Act ("DMCA") to be sent to service providers of IP addresses where MEU confirmed infringement of copyright protected content.

114. Each Notice included at least the name of the copyright owner, the title of the Work, the manner by which it was infringed, the infringing file name which includes the altered Copyright Management Information, the IP address and port number at where infringement was confirmed and the time of infringement down to the second. *See* Exhibit "D" (Attached Exhibits 1-2) (excerpt below).

18

---

**Formatted:** Indent: Left: 0", First line: 0.2", Right: 0", Space Before: 0 pt, Numbered + Level: 1 + Numbering Style: 1, 2, 3, … + Start at: 1 + Alignment: Left + Aligned at: 0.25" + Indent at: 0.5", Don't swap indents on facing pages

**Formatted:** Font: Not Bold

**Deleted:** E

**Deleted:** (c)

Protocol: BITTORRENT
Infringed Work: Hunter Killer
Infringing FileName: Hunter Killer (2018) [WEBRip] [720p] [YTS.AM] Infringing FileSize: 1092418176
Infringer's IP Address: 209.150.44.177 Infringer's Port: 38521 Initial Infringement Timestamp: 2020-06-08 06:32:55

Protocol: BITTORRENT
Infringed Work: Rambo: Last Blood
Infringing FileName: Rambo.Last.Blood.2019.1080p.KORSUB.HDRip.x264.AAC2.0-STUTTERSHIT
Infringing FileSize: 3437872497
Infringer's IP Address: 209.150.44.177
Infringer's Port: 41915
Initial Infringement Timestamp: 2020-10-09 19:51:44

115. MEU determines the proper service provider assigned the IP addresses at issue from publicly

available information from ARIN.

116. MEU determines the proper abuse contact email address for the service provider assigned the IP

addresses from the ARIN records, DMCA designated directory and Defendants' website.



117. Plaintiffs' agent sends the Notice to the abuse contact email address.

118. Defendants are required to update the WHOIS records for the IP addresses it reassigns or

19

reallocates per their registration agreement with ARIN.

119. Plaintiffs' agent has sent over 5,400 Notices to Defendants concerning infringements of copyright protected Works including Plaintiffs' at IP addresses assigned to Defendants from ARIN.

120. For example, Plaintiffs' agent sent over 1,700 Notices to Defendants concerning infringement of the motion picture *Angel Has Fallen* at IP addresses assigned to Defendants from ARIN.

121. For example, Plaintiffs' agent sent over 1,400 Notices to Defendants concerning infringement of the motion picture *Rambo V: Last Blood* at IP addresses assigned to Defendants from ARIN.

122. For example, Plaintiffs' agent sent over 300 Notices to Defendants concerning infringement of the motion picture *Ava* at IP addresses assigned to Defendants from ARIN.

123. For example, Plaintiffs' agent sent over 300 Notices to Defendants concerning infringement of the motion picture *The Outpost Killer* at IP addresses assigned to Defendants from ARIN.

124. Plaintiffs' agent sent over 100 Notices to Defendants concerning observed infringements at each of IP addresses 65.78.99.191, 207.172.202.107 and 209.94.139.49.

125. Upon information and belief, other rightsholders had similar Notices sent to Defendants concerning infringing activity at IP addresses assigned to Defendants from ARIN with altered CMI.

126. Defendants failed to terminate the subscribers of the accounts associated with these IP addresses or take any meaningful action in response to these Notices.

127. Defendants often failed to even forward the Notices to their subscribers.

128. Defendants continued to provide service to their subscribers despite knowledge that their

20

subscribers were using the service to engage and facilitate massive piracy of Plaintiffs' copyright protected Works.

129. Plaintiffs' counsel sent a letter to Defendant RCN Telecom Services, LLC detailing these concerns and pointing to detailed examples of prolific piracy behavior by subscribers on Oct. 19, 2020. *See* Exhibit "D".

130. Defendants completely ignored the letter and continued to provide service to even the subscribers engaged in prolific piracy detailed in the letter.

131. Defendants' failure to terminate or take any meaningful action against their subscribers resulted in a cascade of piracy of Plaintiffs' Works.

**G) Defendants Control the Conduct of Their Subscribers.**

| Deleted: F |
|---|

132. Defendants can terminate the accounts of their subscribers at any time.

133. Upon information and belief, Defendants promptly terminate subscriber accounts for committing any prohibited or abusive activities or failing to pay for the service. *See* Decl. of Joshua Lee at ¶5.



21

> ← C   🔒 rcn.com/hub/about-rcn/policies-and-disclaimers/customer-terms-and-conditions/
>
> 14. **Termination of Service:** Customer may terminate any or all services at any time by notifying RCN of its desire to do so. This Agreement and the services provided hereunder may be terminated (a) by RCN at any time without prior notice (i) if the Customer fails to comply in full with all the terms herein; (ii) Customer makes any express or implied threat of violence, or uses derogatory language, towards any employee, representative, or contractor of RCN; or (iii) if RCN loses the right or ability to use public rights-of-way necessary to serve Customer, or (b) by Customer, at any time, upon notice to RCN, provided all Equipment is returned immediately to RCN. Upon termination of services, all Equipment must be returned immediately and outlets disconnected to avoid additional or continuing charges. In the event of termination by RCN, any restoration of service shall be solely at RCN's discretion and on such terms as RCN shall determine are necessary to resume service on a commercially reasonable basis.

134. Indeed, Defendants explicitly state that they have the right to disconnect or temporarily suspend a subscriber's account, including for DMCA violations. Yet, Defendants have failed to actually act on these purported policies. *See* *Id.*

> ← C   🔒 rcn.com/hub/about-rcn/policies-and-disclaimers/internet-service-agreement/
>
> 3. You agree that RCN retains the right, but not the obligation, to restrict or terminate your Access Service at any time, if RCN, in its sole discretion, determines that you are in violation of this Agreement and/or RCN's Online Policies. You agree that, if RCN determines that you are in violation of this Agreement, any restriction or termination of your Access Service will be effective immediately, without prior notice. You agree that RCN will have no liability to you for any restriction or termination of your Access Service pursuant to such violation.
>
> 4. YOU AGREE THAT IF RCN TERMINATES YOUR ACCESS ACCOUNT AS A RESULT OF YOUR VIOLATION OF THIS AGREEMENT OR RCN'S ONLINE POLICIES, YOU FORFEIT ANY RIGHT TO A REFUND OF ANY PREPAID ACCOUNT CHARGES, SUCH FORFEITURE BEING AGREED TO BY YOU AND RCN AS LIQUIDATED DAMAGES AND NOT AS A PENALTY. You further agree that RCN is under no obligation to forward any email for an account canceled due to a violation. RCN reserves the right to refuse the application or reapplication of anyone whose account has been canceled for a violation, or anyone whom RCN suspects is acting on behalf of someone whose account has been canceled for a violation. RCN reserves the right to cancel or suspend all other accounts belonging to you if one of your accounts was involved in a violation.
>
> 5. RCN reserves the right to disconnect and/or temporarily suspend an account from RCN's service without warning if in RCN's sole discretion there is a reasonable suspicion that such disconnection or suspension would prevent or interrupt a violation of applicable law, this Agreement, or RCN's Online Policies.
>
> 6. Subject to the provision of the Digital Millennium Copyright Act and any other applicable laws and regulations, RCN reserves the right to remove or block access to, either permanently or temporarily, any files which RCN suspects or which a third party alleges are associated with a violation of the law, this Agreement or RCN's Online Policies or with the account responsible for such violation.

135. Defendants explicitly state that they may take responsive action to violations or "reasonable suspicion" of violations of any of their policies, including the provisions of the DMCA, such as disconnecting and/or temporarily suspending a subscriber's account, or removing or blocking access to any files. *Id.*

136. Defendants monitor and/or control the content that their subscribers access or which websites they visit.

137. Defendants have the ability to determine whether their subscriber's service is being used for operating file-sharing programs such as BitTorrent and whether the subscriber's service is being used to distribute copies of copyright protected content.

22

**H) Defendants Do Not Have a Safe Harbor From Liability.**

138. As part of the DMCA, Congress created a safe harbor that limits the liability of a service provider for copyright infringement when their involvement is limited to, among other things, "transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(a). To benefit from this safe harbor, however, an ISP must demonstrate that it "has adopted and reasonably implemented...a policy that provides for the termination in appropriate circumstances of subscribers...who are repeat infringers." 17 U.S.C. § 512(i)(1)(A).

139. Defendants have not adopted or reasonably implemented a policy of terminating repeat infringers.

140. Plaintiffs' agent has sent over 5,400 Notices to Defendants concerning infringements at IP addresses Defendants publish as assigned to them.

141. Defendants failed to terminate the accounts and/or take any meaningful actions against their subscribers in response to the Notices consistent with a reasonably implemented policy for termination of subscribers and account holders of the service provider's system or network who are repeat infringers necessary to support a safe harbor from liability ("policy").

142. Defendants specifically state in their policy that "RCN Telecom Services, LLC will terminate the subscriptions of repeat copyright infringers." *See* https://www.rcn.com/hub/about-rcn/policies-and-disclaimers/dmca-policy-and-procedure/ [last accessed November 5, 2021].

143. Below are examples of Defendants' failure to reasonably implement the requisite Policy.

144. Defendants failed to terminate the account and/or take any meaningful action against their subscriber at IP address 65.78.99.191 even after Plaintiffs' agent sent 150 Notices.

145. Defendants failed to terminate the account and/or take any meaningful action against v

Deleted: G

Deleted: do not have

Formatted: Font color: Black, Not Expanded by / Condensed by

Formatted: Font: Not Italic

subscriber at IP address 207.172.202.107 even after Plaintiffs' agent sent over 140 Notices and Plaintiffs' counsel sent a letter.

146. Defendants failed to terminate the account and/or take any meaningful action against their subscriber at IP address 209.94.139.49 even after Plaintiffs' agent sent over 100 Notices and Plaintiffs' counsel sent a letter.

147. Defendants failed to terminate the account and/or take any meaningful action against their subscriber at IP address 209.150.44.177 even after Plaintiffs' agent sent over 90 Notices and Plaintiffs' counsel sent a letter.

148. Defendants failed to terminate the account and/or take any meaningful action against their subscriber at IP address 66.44.13.123 even after Plaintiffs' agent sent over 80 Notices and Plaintiffs' counsel sent a letter.

149. Defendants failed to terminate the account and/or take any meaningful action against their subscriber at IP address 216.80.112.90 even after Plaintiffs' agent sent at least 80 Notices and Plaintiffs' counsel sent a letter.

150. Indeed, Defendants have failed to follow their own purported policy.

151. Defendants' conduct renders them ineligible for safe harbor immunity from copyright liability under the DMCA.

**H) The Copyright Infringements Arise from Defendants' Advertisements.**

152. At all relevant times, Defendants' subscribers have paid substantial subscription fees for access to Defendants' high-speed Internet network.

153. Defendants offer a tiered pricing structure so their subscribers can have even higher downloading and uploading speed for a higher monthly fee. *See*, e.g., https://www.rcn.com/dc-metro/high-speed-internet/#shop [last accessed on July 22, 2021].



154.  Defendants advertise their highest tier for "gaming internet" and emphasizes the high upload and download speeds for $49.99 with download speeds up to 940 Mbps.

155.  As recently as March 5, 2020, Defendants advertised the ability to use this tier of service to "Download an HD movie in a Snap" and to "Download a TV show, an album or photos in a Flash". *See* Decl. of Joshua Lee at ¶¶6-7.



156. Defendants' subscribers are motivated to become subscribers from Defendants' advertisements.

157. Defendants' subscribers are motivated to become subscribers from the knowledge of Defendants' practice of ignoring notices of infringements or failing to take any meaningful action.

**First Cause of Action**
**(Contributory Copyright Infringement based upon material contribution)**

158. Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

159. Through their activities, Defendants knowingly and intentionally took steps that are substantially certain to result in direct infringement of Plaintiffs' Copyrighted Works, and that have resulted in such direct infringement in violation of Plaintiffs' copyrights.

160. Despite Defendants' knowledge that their subscribers were using their service to engage in widescale copyright infringements, Defendants have failed to take reasonable steps to minimize

the infringing capabilities of their service.

161. Despite Defendants' knowledge that their subscribers were using their service to engage in widescale copyright infringements via BitTorrent a protocol, which is overwhelmingly used for piracy, Defendants have failed to take reasonable steps to minimize the infringing capabilities of their service.

162. Defendants are liable as contributory copyright infringers for the infringing acts of their subscribers.  Defendants have actual and constructive knowledge of the infringing activity of their subscribers.  Defendants knowingly caused and otherwise materially contributed to these unauthorized distributions of Plaintiffs' Works.

163. Defendants' contributory infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

164. By engaging in the contributory infringement alleged in this First Amended Complaint, Defendants deprived not only the producers of the Works from income that could have been derived when the respective film was shown in public theaters and offered for sale or rental, but also all persons involved in the production and marketing of this film, numerous owners of local theaters and retail outlets and their employees, and, ultimately, the local economy.  Defendants' misconduct therefore offends public policy.

165. Plaintiffs are entitled to elect to recover from Defendants statutory damages for violations of 17 U.S.C. § 1202.

**Second Cause of Action**
**(Vicarious Infringement)**

166. Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

167. Defendants are vicariously liable for the infringing acts of their subscribers' infringements including but not limited to their subscribers' direct infringements of Plaintiffs' exclusive right to reproduce and distribute copies of their Works.

168. Defendants have the right and ability to supervise and control the infringing activities that occur through the use of their service, and at all relevant times has derived a direct financial benefit from the infringement of Plaintiffs' copyrights.

169. Defendants have refused to take any meaningful action to prevent the widespread infringement by their subscribers.  Indeed, the ability of subscribers to use Defendants' service to engage in widespread piracy of copyright protected content including Plaintiffs' Works without having their services terminated despite multiple notices being sent to Defendants act as a powerful draw for subscribers of Defendants' service.

170. The ability of subscribers to use Defendants' high-speed service to infringe Plaintiffs' Works without having their services terminated despite multiple notices being sent to Defendants acts as a powerful draw for subscribers of Defendants' service.

171. Defendants are therefore vicariously liable for the unauthorized reproduction and distribution of Plaintiffs' Works.

### Third Cause of Action
### (Application for Website-Blocking Injunction)

172. Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

173. Defendants have actual knowledge of their subscribers' infringements of Plaintiffs' exclusive rights under the Copyright Act by their subscribers' use of notorious piracy websites that are of foreign origin to pirate Plaintiffs' Works.

28

174. Despite having said actual knowledge, Defendants continues to provide services to their subscribers.

175. Defendants' actions of providing transmission, routing, or connections for said copies of the Works to their subscribers is a direct and proximate cause of the infringements of Plaintiffs' Works.

176. Defendants had actual or constructive knowledge of infringement of Plaintiffs' exclusive rights under the Copyright Act by their subscribers. Defendants knowingly and materially contributed to such infringing activity.

177. Plaintiffs suffer irreparable harm from Defendants' failure to take even simple actions to stop further piracy of their Works by Defendants' subscribers.

178. Defendants' subscribers are depriving Plaintiffs of their exclusive rights to control how, when, and to whom they will disseminate their Copyrighted Works.

179. Defendants' subscribers' distribution of freely available infringing copies of the Works inevitably and irreparably undermines the legitimate market in which consumers can purchase access to the same Works.

180. Defendants' subscribers' distribution of freely available infringing copies of the Works threaten harm to Plaintiffs' relationships and goodwill with authorized licensees.

181. The hardship Plaintiffs will face without the injunction prayed for outweighs any harm to the Defendants' interests in profiting from allowing their subscribers to use their service to pirate Plaintiffs' Works.

182. The public has a compelling interest in protecting copyright owners' marketable rights to their works, particularly from foreign websites that profit from widespread piracy of US copyright protected Works.

29

183.  As a direct and proximate result of the infringement to which Defendants knowingly and materially contribute and contributed, Plaintiffs are entitled to injunctive or other equitable relief as provided by, for example, 17 U.S.C. §§ 512(j)(1)(A) and (B) including but not limited to an order restraining the Defendants from providing access to infringing material or activity residing at movie piracy websites including but not limited to: (a) YTS; (b) Piratebay; (c) Rarbg; and (d) 1337x; and/or taking reasonable steps to block access to said movie piracy websites.

**Fourth Cause of Action**

**(Secondary Liability for Digital Millennium Copyright Act Violations)**

184. Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

185. Defendants' subscribers knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the Plaintiffs' copyright protected Works, distributed copyright management information ("CMI") that falsely included wording such as "YTS" and "RARBG" in violation of 17 U.S.C. § 1202(a)(2).

186. Defendants' subscribers knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the copyright protected Works distributed CMI that falsely included the wording such as "YTS" and "RARBG" or in violation of 17 U.S.C. § 1202(a)(2).

187. Defendants' subscribers knowingly and with the intent to induce, enable, facilitate, or conceal infringement of the copyright protected Works distributed CMI that falsely included the wording such as "YTS" and "RARBG" in violation of 17 U.S.C. § 1202(a)(2).

188. Defendants' subscribers, without the authority of Plaintiffs or the law, distributed removed or altered CMI knowing that the CMI had been removed or altered to include wording such as "RARBG" and "YTS" without the authority of the Plaintiffs and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of Plaintiffs'

Copyright protected Works in violation of 17 U.S.C. § 1202(b)(2).

189. Defendants' subscribers, without the authority of Plaintiffs or the law, distributed Plaintiffs' Copyright protected Works knowing that the CMI had been removed or altered to include wording such as "RARBG" or "YTS", and knowing, or having reasonable grounds to know, that it will induce, enable, facilitate, or conceal infringement of the copyright protected Works in violation of 17 U.S.C. § 1202(b)(3).

190. Particularly, Defendants' subscribers knew that the CMI in the file names of the pieces of the Work had been altered to include wording such as "RARBG", "YTS" or "FGT".

191. Particularly, Defendants' subscribers distributed the file names that included CMI that had been altered to include the wording "YTS" or "RARBG".

192. Defendants' subscribers knew that the wording "YTS" or "FGT" originated from notorious movie piracy website.

193. Defendants' subscribers' acts constitute violations under the Digital Millennium Copyright Act ("DMCA violation"), 17 U.S.C. § 1202.

194. Through their conduct, Defendants knowingly and intentionally induced, enticed, persuaded, and caused their subscribers to constitute DMCA violations.

195. Through their activities, Defendants knowingly and intentionally take or took steps that are substantially certain to result in their subscribers committing DMCA violations, and that have resulted in DMCA violations.

196. Despite Defendants' knowledge that their subscribers use their service to commit DMCA violations, Defendants have failed to take reasonable steps to minimize the capabilities of their service to facilitate DMCA violation.

197. Defendants are secondarily liable for the DMCA violations of their subscribers.

31

Defendants have actual and constructive knowledge of their subscribers' DMCA violations. Defendant knowingly caused and otherwise materially contributed to these DMCA violations.

198. Defendants are vicariously liable for the DMCA violations of their subscribers. Defendants have the right and ability to supervise and control the DMCA violations that occur through the use of their service, and at all relevant times have derived a direct financial benefit from the DMCA violations complained of herein.  Defendants have refused to take any meaningful action to prevent the widespread DMCA violations by their subscribers.  Indeed, the ability of Defendants' subscribers to use Defendants' service to engage in widespread DMCA violations while pirating content without having their services terminated despite multiple notices being sent to Defendants acts as a powerful draw for subscribers of Defendants' service.  Defendants are therefore vicariously liable for the DMCA violations.

199. Plaintiffs are entitled to an injunction to prevent Defendants from engaging in and/or contributing to further violations of 17 U.S.C. § 1202.

200. Plaintiffs are entitled to recover from Defendants the actual damages suffered by Plaintiffs and any profits Defendants have obtained as a result of their wrongful acts that are not taken into account in computing the actual damages. Plaintiffs are currently unable to ascertain the full extent of the profits Defendants have realized by their violations of 17 U.S.C. § 1202.

201. Plaintiffs are entitled to elect to recover from Defendants statutory damages for their violations of 17 U.S.C. § 1202.

202. Plaintiffs are further entitled to costs and reasonable attorneys' fees.

**Prayer for Relief**

WHEREFORE, the Plaintiffs respectfully request that this Court:

(A) enter permanent injunctions enjoining Defendants from continuing to contribute to infringements of the Plaintiffs' copyrighted Works and DMCA violations;

(B) order Defendants to adopt a policy that provides for the prompt termination of subscribers for which Defendants receive more than three unique notices of infringements of copyright protected Works within 72 hours without receiving a counter notification from said subscriber;

(C) order Defendants to block subscribers from accessing notorious piracy websites of foreign origin including but not limited to: (a) YTS; (b) Piratebay; (c) Rarbg; and (d) 1337x that are listed in the annual trade report of Notorious Foreign Markets published by the United States Government on all networks under their control to prevent further pirating of Plaintiffs' Works via the BitTorrent protocol;

(D) order Defendants to disclose to Plaintiffs the identifications of the subscribers who used and use Defendants' service to infringe Plaintiffs' Works on an ongoing basis after said subscribers are provided notice as required by 47 U.S.C. § 551;

(E) award the Plaintiffs their actual damages from the copyright infringements and Defendants' profits in such amount as may be found; alternatively, at Plaintiffs' election, for maximum statutory damages of $150,000/copyright (or a total of at least $7,950,000 for 53 copyrights) pursuant to 17 U.S.C. § 504(a) and (c) against Defendants jointly and severally;

(F) award the Plaintiffs their actual damages from the DMCA violations and Defendants' profits in such amount as may be found; or, in the alternative, at Plaintiffs' election, for maximum statutory damages of $25,000 for each DMCA violation pursuant to 17 U.S.C. § 1203(c) for a total of at least $3,750,000 for contributing to more than 150 violations of and/or vicariously violating 17 U.S.C. § 1202;

33

(G) award the Plaintiffs their reasonable attorneys' fees and costs pursuant to 17 U.S.C. §
505; and

(H) grant the Plaintiffs any and all other and further relief that this Court deems just and
proper.

The Plaintiffs hereby demand a trial by jury on all issues properly triable by jury.

Dated: November 15, 2021

By:      /s/Michael Cukor

**MCGEARY CUKOR LLC**
7 Dumont Place
Morristown, NJ 07960
(973) 339-7367
mcukor@mcgearycukor.com

34