# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| BODYGUARD PRODUCTIONS, INC., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> RCN TELECOM SERVICES OF MASSACHUSETTS, LLC and RCN TELECOM SERVICES, LLC, <br><br> Defendants. | Civil Action No. 3:21-cv-15310-FLW-TJB <br><br> **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS PLAINTIFFS' COMPLAINT** |

---

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS PLAINTIFFS' COMPLAINT

---

20-0231A

# TABLE OF CONTENTS

Page

Table of Authorities…………………………………………………………………... 3

I.      Introduction……………………………………………………………… 7

II.     Factual Background……………………………………………………….. 11

III.    Legal Standard…………………………………………………………….. 15

IV.     The FAC Adequately Pleads a Claim for Secondary Copyright

Infringement……………………………………………………………… 16

      A.      Defendants' Subscribers Directly Infringe Plaintiffs' Exclusive

      Rights……………………………………………….................................... 17

            1.      Plaintiffs have Adequately Identified the Direct Infringers….. 18

            2.      Plaintiffs have Plausibly Alleged that Defendants Materially

            Contributed to the Alleged Infringement……………………… 21

            3.      Plaintiffs have Adequately Alleged Conduct by Defendants that

            Supports Contributory Liability…………………………….. 23

            4.      Plaintiffs have Adequately Alleged Conduct by Defendants that

            Supports Vicarious Infringement…………………………… 26

V.      The FAC Adequately Pleads a Claim for Secondary Liability for DMCA

Violations………………………………………………………………… 28

2

20-023T

A.     Section 1202 Provides for Secondary Liability………………….….. 28

B.     Plaintiffs Plausibly Alleged that Defendants Engaged in Conduct

Supporting Secondary Liability for their Subscribers' DMCA Violations.... 29

C.     Plaintiffs Plausibly Alleged the Existence of CMI………………… 31

D.     Plaintiffs have Plausibly Alleged that CMI was False or Altered…... 33

E.     Plaintiffs Plausibly Alleged that Defendants' Subscribers Violated

Section 1202……………………………………………………………. 34

VI.    The FAC Adequately Pleads a Claim for Injunctive Relief……………. 36

VII.   Conclusion…………………………………………………………… 38

## TABLE OF AUTHORITIES

### *Statutes and Rules*

17 U.S.C. §1202……………………………………………….................. 28-36

Fed. R. Civ. Pro. 12(b)(6)…………………………………………….... 15-16

17 U.S.C. § 502………………………………………………………... 37

17 U.S.C. § 512(j)……………………………………………………… 37

### *Cases*

*AF Holdings, LLC v. Does* 1–1058, 752 F.3d 990 (D.C. Cir. 2014) …………..… 9

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868

20-023T

(2009)…………………………………………………………………… 15-16, 18, 20

*Atlanta Photography, LLC v. Ian Marshall Realty, Inc*., No. 1:13-CV-2330-AT, 2014 U.S. Dist. LEXIS 188894, 2014 WL 11955391 (N.D. Ga. Mar. 7, 2014)……………………………………………………………………... 29

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)……………………………………………………………………… 16, 20

*BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc*., 199 F. Supp. 3d 958 (E.D. Va. 2016)…………………………………………………………………... 22

*BMG Rights Mgmt. (US) LLC v. Cox Communs., Inc*., 881 F.3d 293 (4th Cir. 2018)……………………………………………………………………... 26

*Chruby v. Kowaleski*, 534 F. App'x 156, 160 (3d Cir. 2013)………………… 36-37

*Cobbler Nevada LLC v. Gonzales*, 901 F.3d 1142 (9th Cir. 2018)…………… 19-20

*Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc*., 307 F.3d 197 (3d Cir.2002)………………………………………………………………….. 17

*Educ. Impact, Inc. v. Danielson*, No. 3:14-cv-FLW-LHG, 2015 WL 3813329 (D.N.J. Jan. 28, 2015)…………………………………………………….……… 36-37

*Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P*., 948 F.3d 261 (5th Cir. 2020)……………………………………………………….…… 32-34

*Fallen Productions, Inc. et al. v. POPCORNTIME.APP, et al*., 1:21-cv-00282-RDA-TCB, Doc. #60 (E.D. Va. 2021)………………………………………………….. 37

*Gordon v. Nextel Commc'ns & Mullen Adver., Inc.,* 345 F.3d 922 (6th Cir. 2003)……………………………………………………………………... 28

*Hunter Killer Productions, Inc., et al. v. Sabrina Boylan*, 3:20-cv-00306-FM, Doc. #20 (W.D. Tx 2021)……………………………………………………….. 33-35

4

*In re Burlington Coat Factory Sec. Litig*., 114 F.3d 1410 (3d Cir.1997)………………………………………………………... 16, 19

*IQ Group v. Wiesner Pub., LLC*, 409 F.Supp.2d 587 (D.N.J.2006)……………… 32

*Kay Berry, Inc. v. Taylor Gifts, Inc*., 421 F.3d 199 (3d Cir. 2005)…………..…… 17

*Koenig v. Dowdy*, No. 5:15-CV-00347-RN, 2017 U.S. Dist. LEXIS 163850 (E.D.N.C. Sep. 28, 2017)……………………………………………………… 29

*Leonard v. Stemtech Int'l, Inc*., 834 F.3d 376 (3d Cir. 2016)……………… 17, 21, 26-27

*Millennium Funding, Inc. et al. v. Private Internet Access, Inc., et al*., 1:21-cv-1261-RM-SKC, Doc. #46 (D. Colo. 2021)………………………………….…… 37

*MGM Studios Inc. v. Grokster, Ltd*., 545 U.S. 913 (2005)……………….. 23-24, 26

*Murphy v. MILLENNIUM RADIO GROUP LLC*, 650 F. 3d 295 (3d Cir. June 14, 2011) …………………………………………………….……… 32

*Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192 (3d Cir.1993)………………………………………………………………… 16

*Perfect 10, Inc. v. Amazon.com, Inc*., 508 F.3d 1146 (9th Cir. 2007)………………………………………………………… 21, 23-24

*Rosenthal v. E. MPC Computs., LLC*, 493 F. Supp. 2d 182 (D. Mass. 2007)………………………………………………………………... 28

*Santiago v. Warminster Tp*., 629 F.3d 121, 128 (3d Cir. 2010)……………… 15-16

*Sony Corp. of Am. V. Universal City Studios, Inc*., 464 U.S. 417 (1984)…….. 25-26

*Sony Music Entm't v. Cox Communs., Inc*., 426 F. Supp. 3d 217 (E.D. Va. 2019)………………………………………………………………... 20

20-023T

*Stockart.com, LLC v. Engle*, Civil Action No. 10-cv-00588-MSK-MEH, 2011 U.S. Dist. LEXIS 20470 (D. Colo. Feb. 18, 2011)…………………………… 28-29

*UMG Recordings, Inc. v. Grande Communs. Networks, LLC*, 384 F. Supp. 3d 748 (W.D. Tex. 2019) ["*Grande II*"]…………………………………… 8, 11, 20-23, 26

*UMG Recordings, Inc. v. RCN Telecom Servs., LLC*, Civil Action No. 19-17272 (MAS) (ZNQ), 2020 U.S. Dist. LEXIS 158269 (D.N.J. Aug. 31, 2020) ["*RCN I*"]……………………………………………………………… 7, 11, 14, 20-23, 25-27

### *Other Authorities*

Ava, IMDb, https://www.imdb.com/title/tt8784956/……………………………... 9

History of RCN, https://www.rcn.com/hub/about-rcn/our-history/……………… 19

Love Your Tailor, https://www.loveyourtailor.ca/tailor-blog/tailoring-a-pair-of-pants-what-your-tailor-can-do-for-you-a-mens-guide-for-a-perfect-fit/………… 34

RCN Privacy Policy, https://www.rcn.com/hub/about-rcn/policies-and-disclaimers/privacy-policy/ …………………………………………………… 19

RESTATEMENT (SECOND) OF TORTS § 8A cmt. b (1965)………………… 24

20-023T

Plaintiffs AFTER II MOVIE, LLC, BODYGUARD PRODUCTIONS, INC., HITMAN TWO PRODUCTIONS, INC., KILLING LINK DISTRIBUTION, LLC, LHF PRODUCTIONS, INC., MILLENNIUM FUNDING, INC., MILLENNIUM IP, INC., MILLENNIUM MEDIA, INC., MON, LLC, NIKOLA PRODUCTIONS, INC., OUTPOST PRODUCTIONS, INC., RAMBO V PRODUCTIONS, INC., VENICE PI, LLC, VOLTAGE HOLDINGS, LLC, and WONDER ONE, LLC ("Plaintiffs") oppose Defendant's Motion to Dismiss [Doc. #28].

## I.     INTRODUCTION

Defendants do not deny receiving more than 5,400 Notices from Plaintiffs' agent informing of their subscribers' piracy of Plaintiffs' Works.  Defendants also do not deny receiving similar Notices from other rightsholders – such as the more than five million notices alleged to have been sent to it by Rightscorp.  *See UMG Recordings, Inc. v. RCN Telecom Servs., LLC*, Civil Action No. 19-17272 (MAS) (ZNQ), 2020 U.S. Dist. LEXIS 158269, at *6 (D.N.J. Aug. 31, 2020) ("*RCN I*"). Nonetheless, Defendants assert that "RCN has a robust program under which it notifies account holders of infringement allegations and ultimately permanently terminates the account upon receipt of additional complaints." Memo. [Doc. #28-1] at pg. 7.  Defendants' assertion is easily proven wrong by the fact that Plaintiffs'

agent sent over 100 Notices concerning observed infringements at *each* of Defendants' subscribers assigned Internet Protocol ("IP") addresses 65.78.99.191, 207.172.202.107 and 209.94.139.49, yet Defendants still refused to take any meaningful action concerning these subscribers' services. *See* First Amended Complaint ("FAC") [Doc. #22] at ¶¶124-128. Indeed, Plaintiffs' counsel even sent a letter to Defendant RCN Telecom Services, LLC on October 19, 2020 detailing the infringing activity occurring at IP addresses 207.172.202.107 and 209.94.139.49 among other IP addresses that was completely ignored. *See Id.* at ¶¶129-131; Exhibit "D" [Doc. #22-4].  Not surprisingly, the Western District of Texas has already concluded that Defendant's sibling company Grande Communications Networks LLC has not implemented a policy sufficient for a safe harbor.  *See UMG Recordings, Inc. v. Grande Communs. Networks, LLC*, 384 F. Supp. 3d 748 (W.D. Tex. 2019) ["*Grande II*"] (granting summary judgment for Plaintiffs on Grande's lack of safe harbor as an affirmative defense).  Defendants' so-called "robust" policy is a bust for motion picture owners just as the Western District of Texas concluded their sibling company's was for owners of musical works in *Grande II*.

Aware of their busted policy, Defendants begin their memorandum by denigrating Plaintiffs' Works as "direct-to-video movies…". Memo. at pg. 1. However, many of Plaintiffs' Works had successful theater runs such as *London Has*

*Fallen*, *Angel Has Fallen* and *Rambo V: Last Blood*. Moreover, there is no requirement that a motion picture be released in theaters to be worthy of copyright protection. A movie such as *Ava* starring two-time academy award nominee Jessica Chastain (*see* https://www.imdb.com/title/tt8784956/ [last accessed on Dec. 8, 2021]) that was released directly to video during the Coronavirus pandemic is just as worthy of copyright protection as Plaintiff Hitman Two Production's Inc.'s Work *The Hitman's Wife's Bodyguard* that was released in theaters this summer and pirated by Defendants' subscribers with their knowledge.

Next Defendants drop any attempt to maintain a façade of valuing copyright protection for motion pictures over profits from their pirating subscribers by calling Plaintiffs the pejorative mud-slinging term "copyright trolls". Memo. at pg. 2.  To support this proposition, Defendants do not argue that Plaintiffs made or purchased the rights to pornographic movies to sue people – which Plaintiffs of course do not do.  *See AF Holdings, LLC v. Does* 1–1058, 752 F.3d 990, 992 (D.C. Cir. 2014) (describing the "modus operandi" of a copyright troll).  Rather, Defendants merely cite a show cause order [Doc. #28-3] in a Western District of Washington case against Venice PI, LLC without revealing that the same court released the show cause order after the Plaintiff filed a response.  *See* Exhibits "A"-"C".  To top it off, Defendants cite a declaration [Doc. #28-2] of a different attorney from a different

20-023T

copyright case for a *completely different copyright holder* to somehow prove that Plaintiffs are "copyright trolls".

Among Plaintiffs' Works Defendants denigrate as part of a "web of copyright trolls": *Rambo V: Last Blood* which featured legendary actor Silvester Stallone (three Oscar nominations); *London Has Fallen* and *Angel Has Fallen* which featured legendary actor Morgan Freeman (five Oscar nominations and one Oscar for Best Supporting Actor) and legendary actress Angela Basset (Oscar nomination for best actress); *Kill Chain* starring legendary actor Nicholas Cage (two Oscar nominations and one Oscar for Best Actor) and *Tesla* starring Ethan Hawke (four Oscar nominations) who hails from Princeton Junction, New Jersey. *See* FAC at ¶7. Defendants' denigration of Plaintiffs as copyright trolls for merely having the audacity to request them to stop their subscribers' piracy and block the piracy websites their subscribers use is an insult to the script writers, the producers, the directors, the actors, the camerapersons, the location scouts, the stunt persons, the make-up artists, the visual effects artists, the musicians, etc. and everyone who works diligently to make movies. Plaintiffs do not apologize for filing lawsuits against anonymous operators of notorious piracy websites and software applications such as YTS, MkvCage, Popcorn Time and ShowBox, many of which Defendants' subscribers used to pirate Plaintiffs' Works with Defendants' explicit knowledge.

20-023T

*See* Decl. of Culpepper at ¶¶8-12 (describing Plaintiffs' litigation against anonymous piracy operators); Exhibit "C" [Doc. #22-3] to the FAC (records show YTS user downloaded torrent files from Defendants' network); Exhibit "E" [Doc. #22-5] to the FAC (file names of the Works altered to include names of piracy websites YTS, MkvCage, RARBG, etc.)

Plaintiffs are confident this Court can look past the mud thrown by Defendants and reject their many misguided arguments just like all other Courts have done in the context of an Internet service provider including this Court in *RCN I* and the Western District of Texas did for Defendants' sibling company in *Grande II*.

## II.    FACTUAL BACKGROUND

Plaintiffs are producers of popular motion pictures currently available for sale online and in brick and mortar retail stores. Many of these critically acclaimed Works were released in theaters throughout the world and feature A-list actors such as Samuel Jackson, Ryan Reynolds, Sylvester Stallone, Nicholas Cage, Angela Basset, Gerard Butler, Gary Oldman, Common, Linda Cardellini, Milla Jovovich, Pierce Brosnan, Dylan McDermott, Woody Harrelson, James Marsden and Rob Reiner, among others. *See* FAC at ¶7.

Plaintiffs invested significant financial resources, time and effort in making and marketing these Works based upon the expectation that they would have an

11

20-023T

opportunity to get a return on their investment from rentals and sales. Massive piracy of these Works by subscribers of Defendants on peer-to-peer networks such as BitTorrent and Defendants' willful failure to deal with this issue despite clear notice have hindered this opportunity. *See* Id. at ¶8.

Defendants' subscribers accessed notorious piracy websites such as the YTS website to upload and download Plaintiffs' copyrighted Works from IP addresses provided by Defendants. *See* Id. at ¶¶73-74. The YTS website is so notorious for piracy that the United States Trade Representative includes it in its yearly list of Notorious Markets engaged in and facilitating substantial piracy. *See* Id. at ¶72.  The YTS website operator provided Plaintiffs with records of its registered users' activity in connection with a lawsuit. *See* Exhibit "C". For example, the records show that one of Defendants' subscribers registered for an account with the YTS website using email address j65*****@gmail.com and used the account to download a torrent file for pirating the Work *Rambo V: Last Blood* on Nov. 30, 2019 from IP address 207.237.11.70 assigned by Defendants. *See Id*.; FAC at ¶74.

A legitimate file copy of each of the Works includes copyright management information ("CMI") indicating the title.  The initial seeders of the infringing file copies of Plaintiffs' Works added wording to the titles to "brand" the quality of piracy files he or she released and attract further traffic to his or her website.  *See* Id.

12

at ¶¶96-97.  For example, the initial seeder of the infringing file copies of the Work *Angel Has Fallen* added the wording "YTS" to the titles to brand the quality of piracy files he or she released and attract further traffic to the YTS website. *See* Id. at ¶100; Exhibit "E" [Doc. #22-5]. The word YTS is not included in the file title of legitimate copies or streams of the Works. The initial seeder of the Work altered the title to falsely include the words "YTS" in the CMI. The file copies Defendants' subscribers distributed to other peers in the Swarm included the altered CMI in the file title. *See Id.*; FAC at ¶¶100-109.

Plaintiffs and/or their affiliates and other rightsholders engaged Maverickeye UG (haftungsbeschränkt) ("MEU") to monitor peer-to-peer/BitTorrent networks for acts of distribution of their Works and generate Notices of infringements ("Notices") styled per the DMCA to be sent to Internet Service Providers ("ISPs") of IP addresses where MEU confirmed infringement of copyright protected content. *See* Id. at ¶¶83-89, 113. Each Notice included at least the name of the copyright owner, the title of the Work, the manner by which it was infringed, the infringing file name which includes the altered CMI, the IP address and port number at where infringement was confirmed and the time of infringement down to the second under the penalty of perjury. *See* Id. at ¶114; Exhibit "D" at pg. 5. Plaintiffs' Agents sent over 5,400 Notices to Defendants concerning IP addresses associated with

20-023T

confirmed infringing activity. *See* Id. at ¶119.

MEU confirmed thousands of instances of piracy of Defendants' subscribers. For example, MEU logged records showing that the Work *Angel Has Fallen* was shared under the file name "Angel.has.fallen.2019.1080p-dual-lat-cinecalidad.is.mp4" hundreds of times from IP address 65.78.99.191. *See* Id. at ¶93. MEU logged records showing that the Works *Hunter Killer* under the file name "[www.Torrent9.uno]Hunter Killer 2018 FRENCH 720p WEB H264" and *Angel Has Fallen* under the file name "[OxTorrent.com] Angel.Has.Fallen.2019. FRENCH.720p.WEB.H264-FRATERNiTY.mkv" were each shared hundreds of times from IP address 207.172.202.107. *See Id.* at ¶¶94-95.

Other rightsholders had similar Notices sent to Defendants concerning infringing activity at IP addresses assigned to Defendants. *See Id.* at ¶125. For example, in *RCN I*, the Plaintiffs allege that RCN received more than five million notices that its subscribers were using RCN's internet services to engage in the illegal distribution of copyrighted music through online file-sharing programs like BitTorrent. *See RCN I* at *6.

Plaintiffs' counsel sent a letter to Defendant RCN Telecom Services, LLC on Oct. 19, 2020 detailing concerns about its subscribers' widespread piracy of copyright protected content and providing specific examples of rather egregious

20-023T

subscribers assigned IP addresses for each of which more than 50 Notices were sent. *See* Exhibit "D". Defendant RCN Telecom Services, LLC completely ignored the letter. *See* FAC at ¶130.   As pointed out in the letter, Defendants' subscribers distributed thousands of copies of Plaintiffs' Works. *See Id*. at ¶¶124-128. If Defendants had just terminated these subscribers after the fifth, sixth, seventh, eighth, ninth or even tenth Notice, these thousands of instances of piracy could have been prevented.

Defendants incorrectly state that "Plaintiffs do not allege that RCN has any ability to determine what files are stored on the computers and devices people use on its network, or whether there are any filesharing programs running on those devices." Mot. at pg. 3.   Plaintiffs allege that Defendants actively monitor their subscribers' Internet traffic and have the ability to determine whether their subscribers' service is being used for operating file-sharing programs such as BitTorrent, and whether their subscribers' service is being used to distribute copies of copyright protected content. *See* FAC at ¶¶132-137. This allegation is verified by Defendants' own statements on their network management practices[1]. *See* Id.

## III.   LEGAL STANDARD

---

[1]For example, Defendants state "RCN and certain third parties authorized by RCN have the ability to monitor all network traffic destined to and from any connected device attached to RCN's network" https://www.rcn.com/hub/about-rcn/policies-and-disclaimers/privacy-policy/ [last accessed on 12/23/2021].

20-023T

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Santiago v. Warminster Tp.*, 629 F.3d 121, 128 (3d Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)). A plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). While courts must accept well-pled allegations as true, purely conclusory statements are not entitled to this presumption. *Id.* at 678, 681. Therefore, so long as the plaintiff pleads sufficient factual allegations such that the right to relief crosses "the line from conceivable to plausible," she has met the threshold pleading standard. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

In deciding motions to dismiss pursuant to Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir.1997); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir.1993). A document forms the basis of a claim if the document is "integral to or explicitly relied upon in the complaint." *Burlington Coat Factory*, 114 F.3d at 1426

16

(emphasis omitted).

## IV.   THE FAC ADEQUATELY PLEADS A CLAIM FOR SECONDARY COPYRIGHT INFRINGEMENT

"To establish a claim of copyright infringement, a plaintiff must establish: (1) ownership of a valid copyright; and (2) unauthorized copying of original elements of the plaintiff's work." *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 206 (3d Cir.2002). To prove direct infringement, a plaintiff must show that (1) it owns a valid copyright; (2) another party copied elements of its work without authorization; and (3) that party engaged in volitional conduct. *Kay Berry, Inc. v. Taylor Gifts, Inc.*, 421 F.3d 199, 203 (3d Cir. 2005). Volitional conduct occurs when a party engages in "the act constituting infringement." *Leonard v. Stemtech Int'l, Inc.*, 834 F.3d 376, 387 (3d Cir. 2016).  Defendants' subscribers infringe at least Plaintiffs' exclusive rights of reproductions and distribution. *See* FAC at ¶56.

### A.   *Defendants' subscribers directly infringe Plaintiffs' exclusive rights.*

Defendants assert that Plaintiffs do not plausibly allege that RCN's subscribers directly infringed their copyright".  Mot. at pg. 8.  However, Plaintiffs have alleged that: (1) their investigator MEU identified the IP addresses that were using BitTorrent to distribute the Works and logged information including the IP addresses, Unique Hash Numbers, and hit dates that show that Defendants'

20-023T

subscribers distributed copies of the Works (*see* FAC at ¶¶83-89); and (2) the operator of the piracy website YTS provided records of Defendants' subscriber's registered email address, IP address, and time from where the subscriber downloaded torrent files for *Rambo V: Last Blood* (*see* FAC at ¶¶90-91; Exhibit "C").  The Defendants attempt to cast doubt on Plaintiffs' evidence from MEU and the YTS website operator such as asserting "[i]t is concerning that Plaintiffs have submitted this very same Certificate of Authenticity, ***regarding the alleged authenticity of different documents***…". Memo. at pg. 5 (emphasis in original). However, the Certificate of Authenticity refers to the documents in plural, particularly to "records" and "each of the records". Exhibit "C" at pg. 3. Finally, the Court should accept Plaintiffs' well-pled allegations as true at this stage.  *See Iqbal*, 556 U.S. 662, 678.

### 1.    Plaintiffs have adequately identified the direct infringers.

Defendants incorrectly argue, without any case support, that Plaintiffs must make "additional allegations demonstrating that the allegedly infringing activity at that IP address was performed by an RCN subscriber…the Complaint alleges that RCN provides IP addresses to its subscribers, and that *someone* using those IP addresses uploaded or downloaded infringing content." Memo. at pg. 8 (emphasis in original). Defendants' assertions contradict their Internet Access Agreement which

20-023T

states, "Please be advised that the contact person or listed owner of the RCN Internet Account is solely responsible for activities conducted through, on or with their RCN Internet Account, including activities by other persons (including minors) whether or not authorized by such contact person or listed owner." *See* Decl. of Culpepper at ¶2.  This Court can consider Defendants' Internet Access Agreement because it is an undisputedly authentic document that is integral to Plaintiffs' claim that Defendants' subscribers directly infringe the Works, even if the document is not attached to or named in the FAC.  *See Burlington Coat Factory*, 114 F.3d at 1426. Moreover, Defendants' argument misses the point.  Whether the Works were pirated by Defendants' subscribers or the subscribers' household members, the Works were still directly infringed by the subscribers' services and Defendants continue to provide Internet service to these subscribers despite notices of the piracy.

This Court should reject Defendants' argument that the pleading standard of *Cobbler Nevada LLC v. Gonzales*, 901 F.3d 1142 (9th Cir. 2018) the Ninth Circuit applied to a nonprofit adult day care center should be applied to Defendants – a corporate Internet service provider with hundreds of thousands of customers all throughout the biggest cities on the East coast, owned by the billion-dollar private equity fund TPG Capital. *See* Decl. of Culpepper at ¶3; https://www.rcn.com/hub/about-rcn/our-history/ [last accessed on 12/8/2021]

19

("February [of 2017] RCN & Grande Communications were acquired by TPG Capital"). Moreover, because Defendants represent in their published Internet Access Agreement that the subscriber is solely responsible for all users regardless of whether there is evidence the infringement was committed by someone else, Defendants are estopped by their own contrary policy upon being notified of their subscriber's piracy. *Supra*. Finally, the Court also should reject Defendants' proposition because *Cobbler* is contrary to the well-established pleading standards set forth in *Iqbal* and *Twombly*. Indeed, every District Court outside of the Ninth Circuit that has considered this proposition (including when argued by Defendants' counsel on behalf of RCN in this Court and Grande in the Western District of Texas) has rejected it. *See Grande II*, 384 F. Supp. 3d at 767n6 (W.D. Tex. 2019) ("*Grande I*") ("Grande's reliance on *Cobbler*…is misplaced. *Cobbler* involved an individual subscriber who failed to prevent users of his internet subscription from infringing the plaintiff's copyright…*Cobbler* focused on the fact that it was an individual internet subscriber at issue, who paid for internet services to an adult care home he operated, in contrast to the actual ISP defendant in this case."); *RCN I*, 2020 U.S. Dist. LEXIS 158269, n5 ("The Court finds RCN's citations to *Cobbler* … unconvincing. First, *Cobbler* did not address whether a large ISP can be held liable for contributory infringement…Second, as discussed in *Grande II*, the facts of

20

*Cobbler* are inapposite to those presented here."); *Sony Music Entm't v. Cox Communs., Inc*., 426 F. Supp. 3d 217, 235 (E.D. Va. 2019) ("Cox's argument [applying *Cobbler*] is largely inapposite to an ISP defendant."). Defendants feign concern about a certificate of authenticity in Plaintiffs' Complaint. What is concerning is Defendants' failure to cite the published decisions of *RCN I* (of this Court) and *Grande II* that are directly adverse to the positions they advocate despite Defendants' counsel knowing of these decisions since they represent Grande and RCN in these cases.

### 2.    Plaintiffs have plausibly alleged that Defendants materially contributed to the alleged infringement.

To allege a claim of contributory copyright infringement, a plaintiff must allege: "(1) a third party directly infringed the plaintiff's copyright; (2) the defendant knew that the third party was directly infringing; and (3) the defendant materially contributed to or induced the infringement." *Leonard*, 834 F.3d at 387 (3d Cir. 2016) (citing *Perfect 10, Inc. v. Amazon.com, Inc*., 508 F.3d 1146, 1171 (9th Cir. 2007) (explaining that an actor may be contributorily liable for intentionally encouraging direct infringement if the actor knowingly takes steps that are substantially certain to result in such direct infringement)).

As stated above, Plaintiffs' agent sent over 5,400 Notices to Defendants

20-023T

concerning infringements of copyright protected Works including Plaintiffs at IP addresses assigned to Defendants.  *See* FAC at ¶140. Each Notice included at least the name of the copyright owner, a statement that it was being sent "under penalty of perjury", the title of the Work, the manner by which it was infringed ("BitTorrent"), the infringing file name which includes the altered Copyright Management Information, the IP address and port number at where infringement was confirmed and the time of infringement down to the second, contact information for the sender, and a PGP signature. *Id*. at ¶43; Exhibit "D" at pg. 5. Plaintiffs' agent sent over 100 Notices to each of Defendants' subscribers at IP addresses 65.78.99.191, 207.172.202.107 and 209.94.139.49 concerning observed infringements. *See* FAC at ¶124. With the IP address and port number where the Plaintiffs' Works were being distributed, Defendants could have promptly identified and told the subscriber to cease the abusive conduct, make a counternotice if the subscriber denied the infringement, or terminate the subscriber's service. Courts in this District and Sister Districts have concluded that Notices that sometimes included less information sufficed for establishing the requisite knowledge for contributory infringement. *See RCN I* at *24-25 (notices from Rightscorp provide factual support for Plaintiffs' allegation that RCN had knowledge of the infringement); *BMG Rights Mgmt. (US) LLC v. Cox Commc'ns, Inc.*, 199 F. Supp. 3d 958, 979 (E.D. Va. 2016)

(finding that the "jury could reasonably conclude that Rightscorp captured infringing activity on Cox's network, and that had Cox received the notices they would have satisfied the knowledge requirement); *Grande II* (the Court was persuaded that UMG pled a plausible claim of secondary infringement based on Grande's alleged failure to act when presented with evidence of ongoing, pervasive infringement by its subscriber from the Rightscorp notices).

Plaintiffs also notes that this Court in *RCN I* denied RCN's motion to dismiss under similar arguments, and the Court in *Grande II* adopted the Safe Harbor Report that RCN's sibling company Grande did not have safe harbor under the DMCA. *See RCN I, Grande II*, 384 F. Supp. 3d at 748 (granting summary judgment for Plaintiffs on Grande's lack of safe harbor as an affirmative defense).

**3.     Plaintiffs have adequately alleged conduct by Defendants that supports contributory liability.**

Defendants argue that Plaintiffs have not satisfied the standard for inducement set forth in *MGM Studios Inc. v. Grokster, Ltd*., 545 U.S. 913 (2005). *See* Memo. at pgs. 13-16. However, Plaintiffs' claim for contributory copyright infringement is based upon material contribution rather than the intentional inducement standard of *Grokster. See* FAC at ¶¶159-165. Moreover, to the extent evidence of intent is required for material contribution, it can be imputed from Defendants' knowledge

23

of their subscribers' ongoing piracy. Particularly, *Grokster* directs the Court to analyze contributory liability in light of common law principles which establish that intent may be imputed. *See Grokster*, 545 U.S. at 930. In *Perfect 10*, the Ninth Circuit looked to the Restatement of Torts for common law principles and stated that "If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." *Perfect 10*, 508 F.3d at 1171 (citing RESTATEMENT (SECOND) OF TORTS § 8A cmt. B (1965)). Such is the case here. Defendants have knowledge of the specific infringing activity yet fail to take simple measures stop it. Some of the simple measures Defendants could have taken include: (1) informing their subscribers of the notices and requesting subscribers to make a counternotice if they denied the piracy (*see* FAC at Prayer for Relief); (2) blocking the notorious piracy websites used by their subscribers (*see id. at* ¶¶135-136); (3) temporarily suspending the accounts of pirating subscribers until they affirmed their commitment not to engage in piracy (*see id. at* ¶134); or (4) terminated the accounts of egregious subscribers (*see id. at* ¶132). Indeed, Defendants maintain their right to cancel the account for a subscriber for merely using "derogatory language" toward any of its employees or contractors. *See Id.* at ¶133. Accordingly, traditional common law principles permit a court to impute intent so that defendant may be liable, by

24

operation of law just as if it had actually intended to infringe.

Defendants also assert that Plaintiffs' must allege that Defendant took "affirmative steps to foster infringement." Memo. at pg. 14. Once again, Defendant conflates inducement with material contribution. To the extent affirmative steps are required, Plaintiffs' allegations in, for example, paragraph 43 of the FAC that Defendants continue to provide Internet services to their subscribers despite receiving thousands of notices of piracy, and purposefully ignore and turn a blind eye to the massive infringement of Plaintiffs' Works occurring over their network satisfies this requirement. *RCN I* at *31.

Defendants also assert that Plaintiffs' claim based upon material contribution must fail because their service is capable of a substantial non-infringing use. *See* Mot. at pg. 16. However, BitTorrent, which Defendants' subscribers use to pirate Plaintiffs' Works, is overwhelmingly (by some measures 96.28% percent of its traffic) used for piracy. *See* FAC at ¶¶57-61. Moreover, *Sony Corp. of Am. V. Universal City Studios, Inc*., 464 U.S. 417 (1984) does not absolve Defendants from liability because Defendants have knowledge that their subscribers pirate content via BitTorrent yet fail to take even the simplest measures to stop further piracy. *See* FAC at ¶176-177. Defendants' proposition that a service provider with knowledge of ongoing infringement by their subscribers can escape liability by merely asserting

20-023T

that their service has substantial non-infringing uses has been repeatedly rejected. This Court rejected Defendant's argument that material contribution to infringement is precluded by the *Sony* Rule because its internet service has substantial non-infringing uses. *See RCN I* at *31. The Court in *Grande II* similarly rejected this argument finding "liability may be imposed for intentionally encouraging infringement through specific acts…The specific act in question here is the continued provision of internet services to customers. Thus, this is not a case of mere refusal to act. Grande acted affirmatively by continuing to sell internet services and continuing to provide internet access to infringing customers." *Grande II* at 767. The Fourth Circuit also called Defendants' argument "meritless" when pointing out that the Supreme Court clarified in *Grokster* that "*Sony* barred secondary liability based on presuming or imputing intent to cause infringement solely from the design or distribution of a product capable of substantial lawful use, which the distributor knows is in fact used for infringement…the fact that a product is 'capable of substantial lawful use' does not mean the producer can never be held contributorily liable. *BMG Rights Mgmt. (US) LLC v. Cox Communs., Inc.*, 881 F.3d 293, 306 (4th Cir. 2018). Once again, counsel for Defendants fail to cite the *Grande II* and *RCN I* decisions that contradict their misguided arguments.

### 4.    **Plaintiffs have adequately alleged conduct by Defendants**

20-023T

**that supports vicarious infringement.**

Vicarious infringement occurs when one "profit[s] from direct infringement while declining to exercise a right to stop or limit it." *Grokster*, 545 U.S. at 930. "To establish vicarious infringement, a plaintiff must prove that the defendant had (1) the right and ability to supervise or control the infringing activity; and (2) a direct financial interest in such activities." *Leonard*, 834 F.3d at 388.

As this Court concluded just last year, "…RCN has the ability to control, supervise, or terminate the accounts of its subscribers." *RCN I* at 35. Defendants do not appear to argue in the contrary. Rather, Defendants argue that Plaintiffs have failed to allege "…whether the infringing activity constitutes a draw for subscribers, not just an added benefit." Memo. at pg. 17. Last year this Court recognized the division in authority between cases that "…require a pleading that the infringing action to be *a* draw, while others require it to be *the* draw." *RCN I* at 37. However, this Court concluded that allegations that RCN's actions in failing to adequately police their infringing subscribers is a draw to subscribers to purchase its services were sufficient for pleading a claim. *See RCN I* at 40. The Plaintiffs make similar allegations in the FAC. Particularly, Plaintiffs allege: "Defendants allowed the illegal activity because it was popular with subscribers and acted as a draw to attract and retain new and existing subscribers" (FAC at ¶43); "…the ability of subscribers

to use Defendants' service to engage in widespread piracy of copyright protected content including Plaintiffs' Works without having their services terminated despite multiple notices being sent to Defendants act as a powerful draw for subscribers of Defendants' service" (Id. at ¶169); and "The ability of subscribers to use Defendants' high-speed service to infringe Plaintiffs' Works without having their services terminated despite multiple notices being sent to Defendants acts as a powerful draw for subscribers of Defendants' service" (Id. at ¶198). Accordingly, Plaintiffs have adequately alleged their claims for vicarious infringement.

## V. THE FAC ADEQUATELY PLEADS A CLAIM FOR SECONDARY LIABILITY FOR DMCA VIOLATIONS

### A.      *Section 1202 provides for Secondary Liability.*

Despite Defendants claiming to be "not aware of any case finding a defendant secondarily liable under the statute [17 U.S.C. 1202]", it is widely established that the principals of secondary liability apply for DMCA violations. For example, in *Gordon v. Nextel Commc'ns & Mullen Adver., Inc.*, 345 F.3d 922, 925-926 (6th Cir. 2003), the Sixth Circuit held that a party may be vicariously liable for others' §1202 DMCA violations when "(1) a defendant has the right and ability to supervise the infringing conduct and (2) the defendant has an obvious and direct financial interest in the infringement" which Plaintiffs sufficiently pleaded. *See* FAC at ¶198.

*Gordon's* holding of secondary liability for §1202 DMCA violations has been cited with approval by: the District of Massachusetts in *Rosenthal v. E. MPC Computs., LLC*, 493 F. Supp. 2d 182, 190 (D. Mass. 2007); the District of Colorado in *Stockart.com, LLC v. Engle*, Civil Action No. 10-cv-00588-MSK-MEH, 2011 U.S. Dist. LEXIS 20470, at *27 (D. Colo. Feb. 18, 2011) (R&R adopted on 4/11/2011); the Northern District of Georgia in *Atlanta Photography, LLC v. Ian Marshall Realty, Inc.*, No. 1:13-CV-2330-AT, 2014 U.S. Dist. LEXIS 188894, 2014 WL 11955391, at *4 and 11 (N.D. Ga. Mar. 7, 2014)("….the Court is satisfied that Plaintiff's allegations state a valid claim of vicarious liability against Defendant Marshall for § 1202 violations."); and the Eastern District of North Carolina in *Koenig v. Dowdy*, No. 5:15-CV-00347-RN, 2017 U.S. Dist. LEXIS 163850, at *22 (E.D.N.C. Sep. 28, 2017).

## **B. Plaintiffs plausibly alleged that Defendants engaged in conduct supporting secondary liability for their subscribers' DMCA violations.**

Defendants argue that Plaintiffs have failed to allege "*facts* showing that RCN: (1) knew any subscriber had violated section 1202; (2) took any steps to encourage or promote the violation…; (3) could supervise or control its subscribers' compliance with section 1202; or (4) directly profited from its subscribers violating section 1202." Memo. at pg. 27. This argument ignores the allegations pleaded in

20-023T

the FAC.

Defendants knew their subscribers' violated section 1202 from: (1) the Notices that Plaintiffs' agent sent that included the specific file name with modified CMI ("Hunter Killer (2018) [WEBRip] [720p] [YTS.AM]" as shown in Exhibit "D" [Doc. #22-4] at pg. 5) and (2) the Oct. 19, 2020 letter from Plaintiffs' counsel that explicitly stated:

> Nearly all of the file titles of the infringing copies have had the copyright management information ("CMI") such as the title of the Work modified or altered to falsely include a reference to a piracy website. For example, the infringing file my clients' agent told RCN about in the Notice shown in Exhibit "1" has the title: "Hunter Killer (2018) [WEBRip] [720p] [YTS.AM]". Similarly, the infringing file my clients' agent told you about in the Notice shown in Exhibit "2" has the title: Rambo.Last.Blood.2019.1080p.KORSUB.HDRip.x264.AAC2.0-STUTTERSHIT". The CMI has been modified/altered to falsely refer to the notorious piracy websites YTS and the piracy group STUTTERSHIT in violation of 17 U.S.C. §1202 ("DMCA violations"). My clients did not provide file titles that promote movie piracy websites or piracy groups.

*Id.* at pg. 3.

Defendants again conflate the inducement standard of *Grokster* with material contribution by arguing that Plaintiffs do not allege that they "took any steps to encourage or promote the violation of section 1202". Plaintiffs allege that Defendants materially contributed to the DMCA violations. *See* FAC at ¶197. To the extent affirmative steps are required, Plaintiffs' allegations (in, for example,

30

paragraph 43 of the FAC) that Defendants continued to provide Internet services to their subscriber despite receiving thousands of notices that included the file title of the infringing copy being pirated that included the altered copyright management information, and purposefully ignoring and turning a blind eye to the massive infringement of Plaintiffs' Works occurring over their network satisfies this requirement.

Contrary to Defendants' argument, Plaintiffs allege that Defendants could supervise or control its subscribers' compliance with section 1202. FAC at ¶198 ("Defendants have the right and ability to supervise and control the DMCA violations that occur through the use of their service…") As stated by Defendants themselves, "RCN retains the right…to restrict or terminate your Access Service at any time…". FAC at ¶134 (Screenshot of Defendants' Acceptable Use Policy)

Contrary to Defendants' argument, Plaintiffs allege that Defendants directly profited from its subscribers violating section 1202. Particularly, Plaintiffs allege that "the ability of Defendants' subscribers to use Defendants' service to engage in widespread DMCA violations while pirating content without having their services terminated despite multiple notices being sent to Defendants acts as a powerful draw for subscribers of Defendants' service." FAC at ¶198.

Accordingly, Defendants are secondarily liable for their subscribers' DMCA

20-023T

violations for the same reasons they are secondarily liable (material contribution and vicarious infringement) for their subscribers' direct copyright infringements.

### *C. Plaintiffs plausibly alleged the existence of CMI.*

Contrary to Defendant's assertion, Plaintiffs explicitly allege that "A legitimate file copy of each of the Works includes copyright management information…indicating the title". FAC at ¶96. *See* Decl. of Culpepper at ¶23 (showing screenshot of file title for Blu-Ray copy of *Mechanic: Resurrection* is MECHANIC_RESURRECTION). File titles of legitimate digital copies of the Works are CMI as defined in 17 U.S.C. §1202(c). While it appears courts in this district have not addressed the specific question of whether a digital file copy title constitutes CMI, this Court fully parsed through the extensive legislative history of the DMCA in *IQ Group v. Wiesner Pub., LLC*, 409 F.Supp.2d 587 (D.N.J.2006). The *IQ* Court cited the Senate Committee Report for the DMCA to conclude that "Under the bill [DMCA], CMI includes such items as the title of the work, the author, the copyright owner, and in some instances, the writer, performer, and director. CMI need not be in digital form, but CMI in digital form is expressly included." *Id.* at 596. The Third Circuit has taken up the logic in *IQ* to hold broadly that "a cause of action under § 1202 of the DMCA potentially lies whenever the types of information listed in § 1202(c)(1)-(8) and 'conveyed in connection with

copies... of a work ... including in digital form' is falsified or removed, regardless of the form in which that information is conveyed." *Murphy v. MILLENNIUM RADIO GROUP LLC*, 650 F. 3d 295, 304-305 (3d Cir. June 14, 2011). Courts in other circuits have reached similar holdings. *See Energy Intelligence Grp., Inc. v. Kayne Anderson Capital Advisors, L.P.*, 948 F.3d 261, 267 (5th Cir. 2020) (holding that file names constitute CMI); *Hunter Killer Productions, Inc., et al. v. Sabrina Boylan*, 3:20-cv-00306-FM, Doc. #20 (W.D. Tx 2021) ("A file name containing a work's title fits squarely within the definition of CMI conveyed with a copy of a work.")(Attached as Exhibit "E").

Defendants assert that, "Plaintiffs do not allege that the digital movie files in question were originally legitimate copies." Mot. at pg. 23.  However, Plaintiffs allege that the initial seeders of the infringing file copies of Plaintiffs' Works used a process referred to as "ripping" to create a copy of the Works from either Blu-ray or legal streaming services and modify the file title of the Work to include a wording such as "RARBG" or "YTS" in the title of the file copies in order to enhance a reputation for the quality of his or her torrent files and attract users to his or her piracy website. See FAC at ¶¶96-112. Plaintiffs further allege that the file copies Defendants' subscribers distributed to other peers in the Swarm included the altered CMI in the file title. *See Id*. Accordingly, contrary to Defendants' assertions,

20-023T

Plaintiffs have plausibly plead relevant CMI.

### *D. Plaintiffs have plausibly alleged that CMI was false or altered.*

Defendants contend that the addition of the names of notorious piracy website such as RARBG or YTS to the file names is not an alteration to CMI. Mot. at pg. 23. Defendants' argument contradicts common English usage of the word alteration such as a tailor performing "alterations" for pants to increase the pants length. *See* https://www.loveyourtailor.ca/tailor-blog/tailoring-a-pair-of-pants-what-your-tailor-can-do-for-you-a-mens-guide-for-a-perfect-fit/ [last accessed on Dec. 9, 2021]. Defendants' argument further contradicts *Energy Intelligence Grp., Inc.* and *Hunter Killer Productions, Inc*. Moreover, Defendants' argument fail when viewed in the context of the title of 17 U.S. Code § 1202 "**Integrity** of copyright management information". The integrity of the CMI of Plaintiffs' Works was certainly destroyed when, for example, the initial seeders modified the CMI to including the piracy sources "MkvCage.mkv", "STUTTERSH*T", "YTS" and "RARBG". *See* Exhibit "E" [Doc. #22-5] (CMI of multiple titles altered to include "MkvCage.mkv", "STUTTERSH*T", "YTS" and "RARBG".) Thus, the CMI has been altered as provided in §1202(b) and is also false as provided in §1202(a) because, for example, MkvCage.mkv was not the author of the Work.

### *E. Plaintiffs plausibly alleged that Defendant's subscribers violated section*

**_1202._**

Plaintiffs do not "vaguely allege that…subscribers generally intended to induce or facilitate infringement." Mot. at pg. 24. Rather, Plaintiffs have made numerous detailed factual allegations concerning Defendants' subscribers' knowledge that the website or BitTorrent Client from which they obtained their torrent files and file copies was distributing illegal copies of the Work with altered CMI and that, in at least one case, Defendants' subscriber had registered an account with the piracy websites YTS. See FAC at ¶¶96-110, 73-74; Exhibit "C". Accordingly, Defendants' subscribers knew that the entity included in the false or altered CMI such as YTS or RARBG was not the author or a licensed distributor of Plaintiffs' Works. _Id_. Plaintiffs have specifically pointed out how Defendants' subscribers' distributions of their Works with altered CMI such as RARBG or YTS specifically promotes the piracy websites where more illegitimate copies of the Works can be obtained. _Id_. Plaintiffs are not aware of any case in this circuit that specifically addresses this issue. However, when faced with very similar conduct, the Court in _Sabrina Boylan_ held:

> Defendant also had reasonable grounds to know the well-known torrent sites that she utilized engaged in illegal distribution. She also had reasonable grounds to know the copies of the work she obtained from the illegal torrent sites were unauthorized. The likelihood is increased as the file names included the names of those sites. As such, Defendant

20-023T

had reason to know transmission of digital copies of the works would facilitate infringement by other users of her swarm who would then download the works.

*Boylan* at pg. 15. Plaintiffs respectfully assert this Court should reach the same conclusion in this case. Accordingly, Plaintiffs have sufficiently alleged how Defendants' subscribers violated Section 1202 and satisfied the double scienter requirement.

Moreover, Plaintiffs respectfully submit that even if the DMCA violations were committed by the subscriber's household member or long term guest, Defendants are still secondarily liable for these violations.

## VI. ARGUMENT – THE FAC ADEQUATELY PLEADS A CLAIM FOR INJUNCTIVE RELIEF

Defendants assert that the FAC fails to state a claim for relief since an injunction is not an independent cause of action. *See* Mot. at 25. Particularly, Defendants assert that the "Third Circuit Court of Appeals has stated that 'an injunction is a remedy rather than a cause of action, so a separate claim for injunctive relief is unnecessary.'". Mot. at pg. 19. However, the Third Circuit cases Defendant cites for this sweeping assertion such as *Chruby v. Kowaleski*, 534 F. App'x 156, 160 (3d Cir. 2013) (a non-precedential opinion) and *Educ. Impact, Inc. v. Danielson*,

20-023T

No. 3:14-cv-FLW-LHG, 2015 WL 381332, at *19 (D.N.J. Jan. 28, 2015) are cases in which a party attempted to obtain equitable relief without a legal basis. Particularly, *Chruby* was an inmate who sought "injunctive relief…for denial of due process during the misconduct hearing." *Chruby*, 534 F. App'x 156, 159 (3d Cir. 2013). The plaintiff in *Danielson* requested injunctive relief "as part of any judgment against the Defendants…" *Danielson* No. 3:14-cv-FLW-LHG, 2015 Lexis 9467, at *53. Here, Plaintiffs are not requesting an injunction under the equitable powers of this Court. Rather, Plaintiffs are applying pursuant to 17 U.S.C. § 512(j), which states, "The following rules shall apply in the case of any application for an injunction under section 502 against a service provider that is not subject to monetary remedies under this section…" *See* FAC at ¶¶2, 173-183. Thus, even if Defendants established a safe harbor and is "not subject to monetary remedies", the Court can still grant an application for the (1)(A) and (B) injunctions of 17 U.S.C. §512(j).

Lastly, Plaintiffs' application for an injunction ordering Defendants to block piracy websites and terminate the accounts of infringing subscribers is squarely within the Copyright Act. 17 U.S.C. §512(j)(1)(A)(ii) and (B)(ii) explicitly provide the Court with authority to grant an order "restraining the service provider from providing access to a subscriber…who is engaging in infringing activity…by

20-023T

terminating the accounts of the subscriber…" and " restraining the service provider from providing access, by taking reasonable steps…to block access, to a specific, identified, online location outside the United States." Thus, Plaintiffs' request for an injunction ordering Defendants to terminate the account of subscribers for which they receive three or more notices and block access to the notorious foreign piracy websites their subscribers use is clearly supported by the text of the law and even less stringent than "engaging in infringing activity" standard of §512(j)(1)(A)(ii). Indeed, numerous service providers in the US such as Sharktech (*Millennium Funding, Inc. et al. v. Private Internet Access, Inc*., et al., 1:21-cv-1261-RM-SKC, Doc. #46 (D. Colo. 2021)) and VPN.HT (*Fallen Productions, Inc. et al. v. POPCORNTIME.APP, et al*., 1:21-cv-00282-RDA-TCB, Doc. #60 (E.D. Va. 2021)) have adopted this type of blocking order which has become common in other English speaking countries as a reasonably countermeasure to piracy. *See* Decl. of Culpepper at ¶¶ 16, 22.

## VII. CONCLUSION

In view of the foregoing, the Defendants' Motion to Dismiss the FAC should be denied. However, should Defendants' Motion be granted, Plaintiffs request leave to amend.

DATED: December 23, 2021.

20-023T

By: /s/Michael Cukor
MCGEARY CUKOR LLC
7 Dumont Place
Morristown, NJ 07960
(973) 339-7367
mcukor@mcgearycukor.com

Kerry S. Culpepper
CULPEPPER IP, LLLC
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawaii 96740
Telephone:   (808) 464-4047
Facsimile:   (202) 204-5181
E-Mail:         kculpepper@culpepperip.com
Attorney for Plaintiffs

20-023T

## CERTIFICATE OF SERVICE

I hereby certify that on the date below I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all attorneys on record.

DATED: January 3, 2021.


By: /s/Michael Cukor
MCGEARY CUKOR LLC
7 Dumont Place
Morristown, NJ 07960
(973) 339-7367
mcukor@mcgearycukor.com

20-023T