**Exhibit "E"**

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### EL PASO DIVISION

| | | |
|---|---|---|
| HUNTER KILLER PRODUCTIONS, INC.; BODYGUARD PRODUCTIONS, INC.; MORGAN CREEK PRODUCTIONS, INC.; VOLTAGE HOLDINGS, LLC; and RAMBO V PRODUCTIONS, INC., | § § § § § § § | |
| | § | EP-20-CV-00306-FM |
| Plaintiffs, | § § | |
| v. | § § | |
| SABRINA BOYLAN, | § § | |
| Defendant. | § | |

## ORDER GRANTING MOTION TO RECONSIDER AND DEFAULT JUDGMENT

Before the court is "Motion for Reconsideration of Order Denying Motion for Default Judgment" ("Motion") [ECF No. 18], filed June 25, 2021 by Hunter Killer Productions, Inc.; Bodyguard Productions, Inc.; Morgan Creek Productions, Inc.; Voltage Holdings, LLC; and Rambo V Productions, Inc. ("Plaintiffs"). Therein, Plaintiffs ask the court to reconsider its "Order Denying Motion for Default Judgment without Prejudice" ("Order") [ECF No. 17], entered June 25, 2021. The Order denied "Plaintiffs' Motion for Default Judgement" [ECF No. 16] for a procedural defect. The record reflects Sabrina Boylan ("Defendant") did not respond to either motion. After due consideration of the Motion and applicable law, the Motion is **GRANTED**.

# I.    BACKGROUND

### A.    *Factual Background*

This case arises from allegations of copyright infringement.  BitTorrent is one of the most common peer-to-peer file sharing protocols used for distributing large amounts of data.[1]  The BitTorrent protocol distributes large files without creating a heavy load on the source computer and network by allowing users to join a "swarm" of host computers.[2]  A BitTorrent Client is a software program that implements the BitTorrent protocol.[3]  "Torrent sites" are websites that index torrent files currently made available for copying and distribution by people using the BitTorrent protocol.[4]

Plaintiff Hunter Killer Productions, Inc. is the owner of the copyright for the motion picture *Hunter Killer*.[5]  Plaintiff Bodyguard Productions, Inc. is the owner of the copyright for the motion picture *The Hitman's Bodyguard*.[6]  Plaintiff Morgan Creek Productions, Inc. is the owner of the copyright for the motion picture *All Eyez on Me*.[7]  Plaintiff Voltage Holdings, LLC is the owner of the copyright for the motion picture *Extremely Wicked, Shockingly Vile and Evil*.[8]  Plaintiff Rambo V Productions, Inc. is the owner of the copyright for the motion picture

---

[1] "Amended Complaint" ("Am. Compl.") ¶ 42, ECF No. 12, filed May 5, 2021.

[2] *Id*. at ¶ 43.

[3] *Id*. at ¶ 44.

[4] *Id*. at ¶ 58.

[5] *Id*. at ¶ 7; "Certificate of Registration Numbers" ("Ex. 2") ECF No. 12-2, Ex. 2.

[6] Am. Compl. ¶ 8; Ex. 2.

[7] Am. Compl. ¶ 10; Ex. 2.

[8] Am. Compl. ¶ 12; Ex. 2.

*Rambo V: Last Blood*.[9]  Collectively, *Hunter Killer*, *The Hitman's Bodyguard*, *Al Eyez on Me*,
*Extremely Wicked and Shockingly Vile*, and *Rambo V: Last Blood* are hereinafter referred to as
the "Works."

Plaintiffs assert Defendant used torrent sites such as YTS and RARBG, either directly or
via a BitTorrent Client such as Popcorn Time, to download torrent files for the Works.[10]
Defendant is a member of a BitTorrent swarm.[11]  The particular BitTorrent swarm is associated
with unique "hash" numbers and file names.[12]  Defendant downloaded, reproduced and
distributed copies of the Works using her BitTorrent swarm's identifying file names and hash
numbers without permission from Plaintiffs.[13]  Defendant knew the copyright management
information ("CMI") included in the files she distributed had been removed or altered without
Plaintiffs' authority.[14]  She also knew the alteration of the file names to include the name of
torrent sites would attract further traffic to the torrent website.[15]

As an employee for a Verizon branded store doing business as VICTRA, Defendant sold
and set up telecommunication equipment such as cell phones, tablets, and computers.[16]
Defendant promoted movie piracy applications to customers and installed piracy applications

---

[9] Am. Compl. ¶ 9; Ex. 2.

[10] Am. Compl. ¶ 19.

[11] *Id*. at ¶ 24.

[12] *Id*.

[13] *Id*. at ¶¶ 26–31.

[14] *See id*. at ¶¶ 75–86.

[15] *See id*.

[16] Am. Compl. ¶¶ 14–15.

onto customers' devices.[17]  In so doing, Defendant increased her compensation by enticing customers to purchase products that she indicated could be used to "watch free movies."[18] Customers then used the piracy applications to infringe copyright protected content.[19]  VICTRA terminated Defendant's employment for promoting and distributing movie piracy apps to customers.[20]

An Internet Protocol ("IP") address is a number assigned by the Internet Service Provider ("ISP") to devices, such as computers or cell phones, that are connected to the internet.[21] Defendant was a Verizon  subscriber assigned the IP address 174.237.5.2 by the ISP, Verizon.[22] Plaintiffs retained Maverickeye UG ("MEU") to identify the IP addresses used by individuals using the BitTorrent protocol to reproduce, distribute, display, or perform the Works.[23]  MEU used forensic software to identify infringing transactions.[24]  MEU then isolated the IP addresses associated with transactions of files identified by the unique hash number used by Defendant's BitTorrent swarm.[25]  MEU determined Defendant's computer used the identified IP addresses to connect to a server to transmit a full copy or portion thereof of a media file of the Works.[26]

---

[17] *Id*. at ¶ 88.

[18] *Id*. at ¶¶ 90–92.

[19] *Id*. at ¶ 89.

[20] *Id*. at ¶ 16.

[21] Am. Compl. ¶¶ 17–18.

[22] *See id*. at ¶¶ 26–31.

[23] *Id*. at ¶ 68.

[24] *Id*. at ¶ 69.

[25] *Id*. at ¶ 70.

[26] *Id*. at ¶¶ 72–73.

B.    *Procedural Background*

Plaintiff Hunter Killer Productions, Inc. filed a complaint in this court on December 9, 2020 alleging direct and contributory copyright infringement in violation of 17 U.S.C. §§ 106 and 501 ("Copyright Act"); and (2) violations under the Digital Millennium Copyright Act, 17 U.S.C. § 1202 ("DMCA").[27]   On January 11, 2021, Plaintiff Hunter Killer Productions, Inc. filed an executed affidavit of service for Defendant.  The process server affirmed Defendant was served on December 16, 2021.[28]   Consequently, Defendant had until February 8, 2021 to file a timely answer.[29]   Defendant did not file an answer.  On May 5, 2021, Plaintiffs jointly filed an amended complaint against Defendant.  On May 13, 2021, Plaintiffs filed an executed affidavit of service, affirming Defendant was served on May 3, 2021.[30]   Defendant had until May 24, 2021 to file a timely answer.[31]   Once again, Defendant failed to file an answer.  Plaintiffs therefore moved for an entry of default judgment, which the Clerk of Court granted on May 25, 2021.[32]

Subsequently, Plaintiffs filed the motion for default judgment against Defendant requesting the following remedies: (1) statutory damages pursuant to Section 504(c)(1) and (2) in the amount of $150,000; (2) additional statutory damages pursuant to Section 1203(c)(3)(B) in the amount of $10,000; (3) attorney's fees in the amount of $9,913; (4) costs in the amount of $834.40; and (5) injunctive relief permanently barring Defendant from directly or contributorily

---

[27] *See generally* "Complaint," ECF No. 1, filed Dec. 9, 2020.

[28] *See* "Proof of Service," ECF No. 7, filed Dec. 23, 2020.

[29] *See* FED. R. CIV. P. 12(a)(1)(A)(i).

[30] *See* "Declaration of Service" 1, ECF No. 13, filed May 13, 2021.

[31] *See* FED. R. CIV. P. 12(a)(1)(A)(i).

[32] *See generally* "Entry of Default," ECF No. 15, entered May 25, 2021.

infringing Plaintiffs' copyrights.[33]   The record reflects Defendant has not attempted to set aside

the entry of default nor has she filed a response to the Motion.  The court entered the Order

denying default judgment citing Plaintiffs' procedural error in failure to move for entry of default

by the Clerk of Court.[34]

## II.      LEGAL STANDARD

### A.      *Motion for Reconsideration*

Rule 60(b) permits courts to grant relief from a final judgment.[35]   The purpose of the rule

is to balance the finality of judgments with the "incessant command of the court's conscience that

justice be done in light of all the facts."[36]   Grounds for relief include "mistake, inadvertence,

surprise, or excusable neglect" under Rule 60(b)(1) and "any other reason justifying relief from

the operation of the judgment" under Rule 60(b)(6).[37]   Rule 60(b)(1) can be invoked "only to

rectify an obvious error of law, apparent on the record."[38]   Rule 60(b)(6) is a "catchall"

provision—"a residual clause used to cover unforeseen contingencies."[39]   A movant is required

---

[33] "Motion for Default Judgement," ECF No. 16, filed June 2, 2021, "Plaintiffs' Memorandum in Support of Motion for Default Judgment" ("Pls' Mem.") 13–18, ECF No. 16-1.

[34] *See generally* "Order Denying Motion for Default Judgment without Prejudice" ("Order"), ECF No. 17, entered June 25, 2021.

[35] FED. R. CIV. P. 60(b); *McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 701 (5th Cir. 2014).

[36] *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401 (5th Cir. 1981) (quoting *Bankers Mortg. Co. v. United States*, 423 F.2d 73, 77 (5th Cir. 1970)).

[37] FED. R. CIV. P. 60(b)(1), (6).

[38] *Hill v. McDermott, Inc.*, 827 F.2d 1040, 1043 (5th Cir. 1987).

[39] *Steverson v. GlobalSantaFe Corp.,* 508 F.3d 300, 303 (5th Cir. 2007) (citing *Stipelcovich v. Sand Dollar Marine, Inc.,* 805 F.2d 599, 604–05 (5th Cir.1986)).

"to show 'extraordinary circumstances' justifying the reopening of a final judgment" pursuant to Rule 60(b)(6).[40]  The initial judgment must have been "manifestly unjust."[41]

While "[i]nterlocutory orders are not within the provisions of Rule 60(b)," it is "within the plenary power of the court that rendered them to afford such relief from them as justice requires."[42]  Federal Rule of Civil Procedure Rule 54(b) provides that interlocutory orders may be "revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."[43]

B.     *Default Judgment*

Under Federal Rule of Civil Procedure 55(a) ("Rule 55(a)"), "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, . . . the clerk must enter the party's default."  After a defendant's default has been entered, a plaintiff may apply for a judgment based on such default.[44]  "A default judgment is a judgment on the merits that conclusively establishes the defendant's liability."[45]  Federal Rule of Civil Procedure 55(b) ("Rule 55(b)") provides two means by which a plaintiff may obtain a default judgment. The plaintiff may apply to the clerk of the court for default judgment when the defendant is neither a minor nor an incompetent person, and the plaintiff's claim is for a sum certain or for a sum which can be made certain by computation.[46]  In all other cases, the party entitled to a

---

[40] *Gonzalez v. Crosby,* 545 U.S. 524, 535 (2005) (quoting *Ackermann v. United States*, 340 U.S. 193, 199 (1950)).

[41] *Edward H. Bohlin Co. v. Banning Co.*, 6 F.3d 350, 356 (5th Cir. 1993).

[42] *Zimzores v. Veterans Admin.,* 778 F.2d 264, 266 (5th Cir. 1985).

[43] FED. R. CIV. P. 54(b).  *See also McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 701 (5th Cir. 2014).

[44] FED. R. CIV. P. 55(b); *New York Life Ins. Co.*, 84 F.3d at 141.

[45] *United States v. Shipco Gen., Inc.*, 814 F.2d 1011, 1014 (5th Cir. 1987).

[46] FED. R. CIV. P. 55(b)(1).

7

judgment by default must apply to the court.[47]  "[A] defendant's default does not in itself warrant

the court in entering a default judgment.  There must be a sufficient basis in the pleadings for the

judgment entered."[48]   In evaluating what constitutes a "sufficient basis" for a default judgment,

the Fifth Circuit held sufficiency is based on the standards of Federal Rule of Civil Procedure 8

("Rule 8"):

> Rule 8(a)(2) requires a pleading to contain a short and plain statement of the claim
> showing that the pleader is entitled to relief.  The purpose of this requirement is to
> give the defendant fair notice of what the claim is and the grounds upon which it
> rests.  The factual allegations in the complaint need only be enough to raise a right
> to relief above the speculative level, on the assumption that all the allegations in
> the complaint are true (even if doubtful in fact).  Detailed factual allegations are not
> required, but the pleading must present more than an unadorned, the-defendant-
> unlawfully-harmed-me accusation.[49]

"The defendant, by [her] default, admits the plaintiff's well-pleaded allegations of fact, is

concluded on those facts by the judgment, and is barred from contesting on appeal the facts thus

established."[50]

The Fifth Circuit also lists the following as relevant factors for consideration before

entering default judgment: (1) whether there are material issues of fact; (2) whether there has

been substantial prejudice; (3) whether the grounds for default are clearly established;

(4) whether the default was caused by a good faith mistake or excusable neglect; (5) the

harshness of a default judgment; and (6) whether the court would think itself obliged to set aside

---

[47] FED. R. CIV. P. 55(b)(2).

[48] *Nishimatsu Constr. Co. v. Hous. Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) (footnote omitted).

[49] *Wooten v. McDonald Transit Assocs.*, 788 F.3d 490, 498 (5th Cir. 2015) (quoting FED. R. CIV. P. 8(a)(2)) (internal quotations omitted); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

[50] *Nishimatsu Const. Co., Ltd.*, 515 F.2d at 1206 (citing *Ohio Central R.R. Co. v. Central Trust Co. of New York*, 133 U.S. 83, 90 (1889); *Thomson v. Wooster*, 114 U.S. 104, 110 (1884) (citations omitted).

the default on the defendant's motion.[51]

## III.  DISCUSSION

The court misapprehended whether Plaintiffs had moved for entry of default by the clerk's office under Rule 55(a).[52]  Plaintiffs fully complied with this mandatory first step to obtaining default judgment under Rule 55(b).[53]  Accordingly, justice requires the court reconsider its denial of default judgment based on a procedural lapse and consider the substance of the Motion.

A default judgment is appropriate under the factors enumerated by the Fifth Circuit.  As Defendant failed to file either an answer or response to the Motion, the court deems all well-pleaded allegations of fact admitted.[54]  As such, no material facts are in dispute.  For the same failure to defend, Plaintiff cannot obtain relief barring default judgment and is therefore highly prejudiced by Defendant's lapse.  There is no reasonable basis to believe default is the result of excusable neglect or a good faith mistake.  Defendant was properly served and therefore aware of this action, but still declined to appear.  Finally, a default judgment would not be unduly harsh.  The penalties for violation of the Copyright act and DMCA are prescribed by statute and the number of violations is determinable by the court.  The grounds for default are clearly established.  As default judgment is procedurally appropriate, the court turns to whether Plaintiffs have met their burden to show a sufficient basis in the pleadings.

---

[51] *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998).

[52] *See* Order 2.

[53] *See generally* "Entry of Default," ECF No. 15, entered May 25, 2021.

[54] *See Nishimatsu Const. Co., Ltd.*, 515 F.2d at 1206.

## A.      Direct and Contributory Copyright Infringement

The Copyright Act provides that, in general, the owner of a copyrighted work has the exclusive right to reproduce, distribute, publicly display the work, and to authorize others to do so.[55]  The Fifth Circuit interprets this statutory right to create both direct and contributory liability for infringers.[56]  "Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright or right of the author."[57]  Anyone who, "with knowledge of the infringing activity, induces, causes or materially contributes to infringing conduct of another" is liable for contributory infringement.[58]  In either case, the legal owner of a copyright is entitled to institute an action for infringement.[59]

A plaintiff asserting a direct copyright infringement claim must demonstrate: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."[60]  Plaintiffs' pleadings demonstrate both requirements are met.  Plaintiffs' ownership of their respective copyrights is commemorated by certificates of registration under the seal of the copyright office.[61]  These certificates conclusively establish Plaintiffs are the legal owners of valid copyrights.  As legal owners, they have the exclusive rights to reproduce, distribute, and publicly display the Works.  Defendant is liable for direct infringement as she downloaded

---

[55] 17 U.S.C. § 106; *BWP Media USA, Inc. v. T&S Software Assocs.,* 852 F.3d 436, 438 (5th Cir. 2017).

[56] *Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.*, 850 F.3d 785, 799 (5th Cir. 2017).

[57] 17 U.S.C. § 501(a); *BWP Media USA, Inc.*, 852 F.3d at 438–39.

[58] *Alcatel USA., Inc. v. DGI Tech., Inc.*, 166 F.3d 772, 790 (5th Cir. 1999).

[59] 17 U.S.C. § 501(b).

[60] *Feist Publ'ns, Inc. v Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

[61] Am. Compl. ¶ 7; Ex. 2.  *See also* 17 U.S.C. § 410(a) (stating a certificate of registration commemorates the Register of Copyrights determination that a work is copyrightable and describing its formalities).

torrent files for the Works from torrent sites known to operate without the consent of copyright owners. This is indisputably a violation of the Copyright Act.[62]

Defendant is liable for contributory infringement as she used her position with VICTRA to promote and distribute piracy applications to customers with the intent that the customers use them to watch copyright protected content. Defendant framed piracy applications as attractive features of particular telecommunication equipment to increase her sales and enrich herself. In so doing, she induced VICTRA customers to engage in direct infringement by downloading copyrighted media.

Defendant's activity closely tracks the common law "classic case" of inducement of infringement identified by the Supreme Court in *Metro-Goldwyn-Mayer Studios, Inc.* Such a case occurs when one advertises infringing uses to make a sale.[63] The Supreme Court held "that one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties."[64] The holding neatly encapsulates Defendant's conduct. She advertised phones, laptops, and tablets by telling customers the piracy applications she downloaded would permit them to watch "free movies."[65] Downloading piracy applications on devices is a clear affirmative step to foster infringement that escalates her conduct beyond

---

[62] *See Maverick Recording Co. v. Harper*, 598 F.3d 193, 197 (5th Cir. 2010) (holding that downloading copyrighted works is a violation of the Copyright Act).

[63] *Metro-Goldwyn-Mayer Studios Inc. v. Grokster Ltd.*, 545 U.S. 913, 935 (2005) (citations omitted).

[64] *Id*. 936–37.

[65] *See* Am. Compl. ¶ 91; Am. Compl., "Declaration of Gerard Prado" ("Prado Decl.") ¶¶ 4–9, ECF No. 12-4.

"merely sell[ing] a commercial product suitable for some lawful use" to contributory infringement on Plaintiffs' copyrights.[66]

MEU's forensic investigation and the declaration of Gerard Prado, a customer to whom Defendant sold a device with a piracy application, together rule out any possibility of mistaken identity. MEU's forensic investigation conclusively linked instances of access to and distribution of infringing copies of the Works to Defendant's IP address.[67] Gerard Prado declared under penalty of perjury that Defendant encouraged him to purchase a tablet from VICTRA by telling him it would enable him to watch free movies.[68] After Prado purchased the tablet, Defendant installed the application "Popcorn Time" on the tablet and instructed Prado on its use to watch movies.[69] Prado used the application to download *Hunter Killer*.

Plaintiffs also argue a "material contribution" theory of contributory infringement. They allege Defendant is liable for infringement of Plaintiffs' Works through her participation in a BitTorrent swarm distributing the Works.[70] The exact bounds of liability for "making available" copyrighted works for download by third parties, without evidence of actual downloads, is undetermined by the Fifth Circuit.[71] Courts disagree about whether such facts are sufficient to

---

[66] *See Metro-Goldwyn-Mayer Studios Inc.*, 545 U.S. at 936.

[67] *See* Am. Compl., "Second Declaration of Daniel Arheidt" ¶ 7, ECF No. 12-3. *See also Maverick Recording Co. v. Harper*, 598 F.3d 193, 196 (5th Cir. 2010) (holding that computer forensic evidence was sufficient to support finding that infringer downloaded audio files from peer-to-peer file-sharing network).

[68] Prado Decl. ¶¶ 4–7.

[69] *Id.* at ¶ 6.

[70] *See* Am. Compl. ¶¶ 114–20.

[71] *See Maverick Recording Co.*, 598 F.3d at 197 (declining to determine whether an individual's participation in a BitTorrent swarm by making works available for download constituted direct infringement).

prove infringement.[72]  Additionally, Plaintiffs do not allege Defendant acted as the "initial

seeder," that is, the individual to first upload the Works for distribution on a torrent site.  Rather,

they argue Defendant violated the Copyright Act merely by "participating" in a swarm.

Plaintiffs explain the way a swarm functions as follows:

> [O]ne initial seeder can create a torrent that breaks a movie up into hundreds or
> thousands of pieces saved in the form of a computer file . . . upload the torrent
> onto a torrent site, and deliver a different piece of the copyrighted Works to each
> of the peers. The recipient peers then automatically begin delivering the piece
> they just received to the other peers in the same swarm.[73]

This explanation highlights that, once an individual joins a swarm, delivery of pieces of a work

occurs automatically.  This diffuse model creates serious questions about whether Defendant, as

a single player in the swarm, who may or may not have uploaded any works, materially

contributed to infringement solely by virtue of her swarm membership.  Plaintiffs do not cite any

law supporting their theory of contributory liability.  This is understandable as support for their

position is sparse.  Plaintiffs' pleadings and exhibits, taken as true, provide a sufficient basis to

determine Defendant is liable for both direct and contributory infringement.  However, Plaintiffs

have not stated sufficient facts to support Defendant's contributory infringement by her mere

participation in a swarm.

   B.      *Digital Millennium Copyright Act Violations*

        "The DMCA was enacted primarily to address long-standing concerns about

technological circumvention of copyright protection."[74]  It reinforces the Copyright Act by

"back[ing] with legal sanctions the efforts of copyright owners to protect their works from piracy

---

[72] *See UMG Recordings, Inc. v. Grande Comms. Networks, Inc.*, 384 F.Supp.2d 743, 763–65 (W.D. Tex. 2019) (collecting cases).

[73] Am. Compl. ¶ 66.

[74] *Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, LP*, 948 F.3d 261, 276 (5th Cir. 2020).

behind digital walls such as encryption codes or password protections."[75]  Section 1202 of the DMCA accomplishes this goal by imposing limitations on the use or alteration of CMI.  CMI is certain identifying "information conveyed in connection with copies . . . of a work, including in digital form."[76]  It includes, among other things, the name or title of a work.[77]

In relevant part, the DMCA prohibits any person from distributing or importing for distribution false CMI "knowingly and with the intent to induce, enable, facilitate, or conceal infringement."[78]  It also prohibits the distribution or importation for distribution of CMI or copyrighted works while knowing the CMI has been removed or altered without authority if she knows or has reasonable grounds to know it would "induce, enable, facilitate, or conceal" copyright infringement.[79]

Plaintiffs allege Defendant violated the DMCA by distributing digital copies of the works *Hunter Killer*, *The Hitman's Bodyguard*, *Al Eyez on Me*, and *Rambo V: Last Blood* with altered file names.[80]  The file names authorized by Plaintiffs contained the works' titles.[81]  A file name containing a work's title fits squarely within the definition of CMI conveyed with a copy of a work.[82]  As such, the DMCA prohibits its removal or alteration.  The copies of the works

---

[75] *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 458 (2007) (internal quotation marks omitted).

[76] 17 U.S.C. § 1202(c).

[77] 17 U.S.C. § 1202(c)(1).

[78] 17 U.S.C. § 1202(a)(2).

[79] 17 U.S.C. § 1202(b)(2–3).

[80] Am. Compl. §§ 121–30.  *Extremely Wicked, Shockingly Vile and Evil* is excluded from this claim.

[81] *Id*. at §§ 76–78.

[82] *Energy Intel. Grp. v. Kayne Anderson Cap. Advisors, LP*, 948 F.3d 261, 277 (5th Cir. 2020).

uploaded to the BitTorrent protocol had altered file names to include the names of torrent sites.[83] This practice is common among initial uploaders to "brand" files.[84] It is intended to facilitate copyright infringement by promoting the torrent sites added to the altered file name.

Defendant, as a member of the swarm, automatically delivered pieces of the works to peers in the same swarm. Plaintiff argues this is distribution of false or altered CMI in violation of the DMCA. Ultimately, this argument relies on the same logic as Plaintiffs' material contribution theory of liability under the Copyright Act—that Defendant may be liable for distribution of copyrighted materials to others by virtue of mere participation in a swarm. The argument is more plausible here, as the DMCA does not ask whether Defendant *materially* contributed to an infringement by another. The threshold for liability is lower. If the CMI has been altered without authority, which is the case here, a Defendant may be liable if she (1) distributed the work; and (2) had reasonable grounds to know the alteration would "induce, enable, facilitate, or conceal" copyright infringement.[85]

Defendant, who received and automatically transmitted pieces of the works to peers as a member of the swarm, distributed the work. Defendant also had reasonable grounds to know the well-known torrent sites that she utilized engaged in illegal distribution. She also had reasonable grounds to know the copies of the work she obtained from the illegal torrent sites were unauthorized. The likelihood is increased as the file names included the names of those sites. As such, Defendant had reason to know transmission of digital copies of the works would facilitate infringement by other users of her swarm who would then download the works.

---

[83] Am. Compl. ¶¶ 75–86.

[84] *Id*. at ¶ 50.

[85] *See* 17 U.S.C. § 1202(b)(2)–(3).

Accordingly, Defendant is liable for violation of the copyrights of the subset of the Works at issue.

    C.    *Relief*

        *1.*    <u>*Statutory Damages*</u>

The Copyright Act permits copyright owners to elect recovery of either statutory damages or actual damages.[86]  Statutory damages are recoverable "for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually . . . in a sum of not less than $750 or more than $30,000 as the court considers just."[87]  In a case of willful infringement, as advanced here, the court "may increase the award of statutory damages to a sum of not more than $150,000."[88]  The language of the DMCA closely tracks that of the Copyright Act with respect to damages.  Should a plaintiff elect to recover statutory damages rather than actual damages, a court shall award "not less than $200 or more than $2,500 per act of circumvention . . . as the court considers just."[89]

The court has wide discretion to award damages within statutory limits.[90]  Committee notes accompanying the Copyright Act indicate that, in setting the broad range of possible damages, Congress intended courts to "adjust recovery to the circumstances of the case."[91]  This is important as not every infringement is of the same magnitude or causes the same harm.

---

[86] 17 U.S.C. § 504(a)(1)-(2).

[87] 17 U.S.C. § 504(c)(1).

[88] 17 U.S.C. § 504(c)(2).

[89] 17 U.S.C. § 1203(c)(3).

[90] *See Douglas v. Cunningham*, 294 U.S. 207, 210 (1935) (finding that "the employment of the statutory yardstick, within set limits, is committed solely to the court which hears the case"); *Broadcast Music, Inc. v. Xanthas, Inc.*, 855 F.2d 233, 237 (5th Cir. 1988) ("[T]he court enjoys wide discretion in setting the amount of damages for each work infringed.).

[91] H.R. REP. NO. 94-1476, at 161 (1976).

Additionally, the damages award necessary to deter future violations by making infringement much more costly than lawful media consumption varies.

Plaintiffs request $30,000 for infringement of their respective works in violation of the Copyright Act, totaling $150,000 for all Plaintiffs.[92]  They request an additional $2,500 for each violation of the DMCA.[93]  Several factors suggest a somewhat lower award of statutory damages. The facts do not establish Defendant's direct infringement extended beyond personal consumption.  Defendant's violations of the DMCA are based on automatic transmission rather than proof of a volitional act beyond joining a swarm.  Defendant's contributory infringement is somewhat more serious as it likely caused more lost revenue than her direct infringement and was done for her own profit.  Even so, the total harm to Plaintiffs is unlikely to be substantial. Finally, Defendant is an individual and therefore likely to feel the deterrent effects of damages at a lower sum than a commercial entity.  After a consideration of the totality of these circumstances, award of damages in the amount of $1,000 per copyright infringement and $250 per DMCA violation is just.  In total, statutory damages are set at: $6,250.

### 2. _Attorney Fees_

Both the Copyright Act and the DMCA permit courts to award "reasonable attorney's fees to the prevailing party."[94]  District courts have broad discretion in calculating reasonable attorney's fee awards.[95]  Reasonable attorney's fees are determined in two steps.  First, the court

---

[92] Pls' Mem. 13.

[93] _Id_.

[94] 17 U.S.C. § 1203(b)(5); 17 U.S.C. § 505.

[95] _Hensley v. Eckerhart,_ 461 U.S. 424, 434 (1983); _Watkins v. Fordice,_ 7 F.3d 453, 457 (5th Cir. 1993).

calculates the "lodestar."[96]  The lodestar is the product of the reasonable hourly rate multiplied by the number of hours reasonably expended on the litigation.[97]  To calculate the lodestar, a district court must first determine the compensable hours from the attorney's time records.[98] Each hour claimed must be supported by attorney billing records.[99]  The court must exclude "excessive, redundant, or otherwise unnecessary" hours.[100]  Next, the district court must "select an appropriate hourly rate based on prevailing community standards for attorneys of similar experience in similar cases."[101]  "Generally, the reasonable hourly rate for a particular community is established through affidavits of other attorneys practicing there."[102]

In step two, the court may adjust the fee award up or down after consideration of any factors articulated in *Johnson v. Georgia Highway Express, Inc.* not already included in the calculation of the lodestar.[103]  Plaintiffs do not assert attorney fees depart from the lodestar, so this step is unnecessary.

Plaintiffs substantially prevailed in this action as Defendant failed to appear and default judgment is granted pursuant to both the Copyright Act and the DMCA as to all Works. Plaintiffs request the following attorney's fees: $4,900 for 14 hours of work at a rate of $350 an

---

[96] *League of United Latin Am. Citizens No. 4552 v. Roscoe Indep. Sch. Dist.*, 119 F.3d 1228, 1232 (5th Cir. 1997).

[97] *Hensley,* 461 U.S. at 434.

[98] *Id*. at 436–37.

[99] *Watkins v. Fordice,* 7 F.3d 453, 457 (5th Cir. 1993).

[100] *Id*.

[101] *Shipes v. Trinity Indus.*, 987 F.2d 311, 319 (5th Cir. 1993).

[102] *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002).

[103] 488 F.2d 714, 717–19 (5th Cir. 1974).  *See also Pennsylvania v. Del. Valley Citizens' Council for Clean Air,* 478 U.S. 546, 565 (1986) (holding that *Johnson* factors that are subsumed in the calculation of the lodestar may not provide an independent basis for increasing the fee award).

hour by Kerry Culpepper; $4,950 for 22 hours at a rate of $225 an hour by Joshua Lee, an associate; and: $63 for 3 hours of work at a rate of $21 an hour by Stephanie Kessner, a legal assistant.[104]  In support, Plaintiffs submit declarations detailing each person's professional experience and hours worked.[105]  Plaintiffs also attach evidence of community standards for rates.  In support of the rates requested by Kerry Culpepper and Joshua Lee, they submit an excerpt from the American Intellectual Property Law Association's 2017 Report of the Economic Survey, which shows a mean hourly rate of $378 for solo practitioners specializing in electrical technologies.[106]  In support of the rates requested by Stephanie Kessner, they attach 2020 occupational employment and wage statistics published by the United States Bureau of Labor Statistics.[107]  These are reasonably reliable sources for determining applicable prevailing rates.

The hours billed reasonably reflect the time spent and are compensable.  The requested rates are also appropriate given prevailing community standards for attorneys of similar experience.  This matter required a precise grasp on technical details of BitTorrent protocols and the application of the somewhat specialty practice area of copyright law.  Culpepper's technical background supports his fee.  It contributed to successful representation and likely saved Plaintiffs time that another attorney may have spent becoming fluent in the facts of the case.  Considering the applicable law and pertinent facts, the requested time and rates will be applied to

---

[104] Pls' Mem. 18.

[105] *See generally id*., "Declaration of Counsel," ECF No. 16-3; *id*., "Declaration of Joshua J. Lee," ECF No. 6-4; *id*., "Declaration of Stephanie Kessner," ECF No. 6-5.

[106] Pls' Mem., "Average hourly billing rate in 2016" 5, ECF No. 16-3.

[107] Pls' Mem., "2020 Occupational Employment and Wage Statistics" 5, ECF No. 16-5.

calculate the lodestar.  After multiplying the stated rates by the compensable hours, reasonable attorney fees are $9,913.

### 3. *Costs*

The Copyright Act states "the court in its discretion may allow the recovery of full costs"[108]  Plaintiffs seek to recover taxable costs of $834.40.  Plaintiff states these costs include the $402 fee for filing the complaint, $65 fee to serve Defendant, and $300 fee for service fees.[109]  However, the sum of these fees is $767, not the requested $834.40.  After due consideration, the court finds it in the interest of justice to grant the request in the amount of $767.

### 4. *Permanent Injunction*

Plaintiffs request the court enjoin Defendant from "infringing Plaintiffs' copyrighted Works in the future" and "knowingly and willfully using BitTorrent or the Internet for copying or downloading Plaintiffs' Works in violation of U.S. copyright law."[110]  Plaintiffs also request the court require Defendant to destroy all copies of the Works she made or used in violation of Plaintiff's copyrights.[111]

Both the Copyright Act and the DCMA authorize courts to permanently enjoin a defendant to restrain copyright infringement or impermissible distribution of copyrighted materials with removed or altered CMI.[112]  The Copyright Act additionally permits courts to require infringers to destroy all copies made or used in violation of the copyright owner's

---

[108] 17 U.S.C. § 1203(b)(5).

[109] Pls' Mem. 18.

[110] *Id*. at 15.

[111] *Id*.

[112] *See* 17 U.S.C. § 502(a); 17 U.S.C. § 1203(b)(1).

exclusive rights.[113]  A plaintiff seeking a permanent injunction must demonstrate that: (1) it has suffered an irreparable injury; (2)  remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) considering the balance of hardships between the parties, a remedy in equity is warranted; and (4) the public interest would not be disserved by an injunction.[114]  In the copyright context, irreparable harm is presumed once a likelihood of success on the merits is established.[115]

This court has already determined Plaintiffs' success on the merits.  As such, there is a presumption of irreparable harm.  The presumption is supported by Plaintiffs' loss of control over their Works and harm to the development of legitimate distribution markets.  There is also no evidence Defendant is likely to cease infringing absent an injunction.  These harms are not adequately compensated by money damages.  Defendant is not unduly burdened by an injunction that requires her to follow the law.  Finally, the public's interest in preserving rights provided by federal copyright law weighs in favor of the injunction.[116]  While copyright violations sometimes raise the question of a public interest in competition or access to beneficial technology,[117] there is no foreseeable public good associated with movie piracy.  In sum, the factors support granting Plaintiffs' request for a permanent injunction and destruction of infringing materials.

---

[113] 17 U.S.C. § 503(b).

[114] *See, e.g.*, *eBay Inc. v. MercExchange, LLC,* 547 U.S. 388, 391 (2006).

[115] *Cf Lexmark Intern., Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 532 (5th Cir. 2004) (weighing preliminary injunction factors, which are substantially similar to the permanent injunction factors).

[116] *See Lakedreams v. Taylor*, 932 F.2d 1103, 1110 (5th Cir. 1991) (finding that the public good is served by upholding copyright laws over the defendant's argument in favor of free market competition).

[117] *See id*.

IV. **CONCLUSION**

After reconsideration, the court finds sufficient basis to grant default judgment.

Accordingly,

1. It is **HEREBY ORDERED** that "Motion for Reconsideration of Order Denying Motion for Default Judgment" [ECF No. 18] is **GRANTED**.

2. It is **FURTHER ORDERED** that Sabrina Boylan ("Defendant") must **PAY** the following damages, fees, and costs to Plaintiffs:

    a. Statutory damages: **$6,250**

    b. Attorney's fees: **$9,913**

    c. Fees and Costs: **$767**

3. It is **FURTHER ORDERED** that Defendant:

    d. Is **ENJOINED** from infringing Plaintiffs' copyrighted Works in the future;

    e. Is **ENJOINED** from knowingly and willfully using BitTorrent or the Internet for copying or downloading Plaintiffs' Works in violation of U.S. copyright law; and

    f. Must **DESTROY** all copies of the Works she made or used in violation of Plaintiff's copyrights.

**SIGNED AND ENTERED** this <u>28th</u> day of **July 2021**.

_____
**FRANK MONTALVO**
**UNITED STATES DISTRICT JUDGE**