

# CULPEPPER IP, LLLC

ATTORNEY AT LAW

75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawaii 96740

TEL: (808) 464-4047
FAX: (202) 204-5181

www.culpepperip.com
―――――――――

PATENTS, TRADEMARKS & COPYRIGHTS

KERRY S. CULPEPPER *

\* ADMITTED TO PRACTICE IN VIRGINIA, HAWAI'I
  AND BEFORE THE USPTO

<u>Via ECF</u>

September 27, 2023

Hon. Tonianne J. Bongiovanni, U.S.M.J.
Clarkson S. Fisher Federal Building
and U.S. Courthouse
402 E. State Street, Room 2020
Trenton, New Jersey 08608

Re:  *BODYGUARD PRODUCTIONS, INC., ET AL., v.  RCN TELECOM SERVICES OF MASSACHUSETTS, LLC*, 3:21-cv-15310-FLW-TJB

Dear Judge Bongiovanni,

I am counsel for Plaintiffs in this case.  I am writing pursuant to your instructions of the Sept. 6, 2023 hearing to provide a short letter explaining Plaintiffs' position on the outstanding discovery disputes.  Plaintiffs previously submitted as Exhibit "1" [Doc. #62-1] a table summarizing issues and each issue's correspondence with outstanding discovery requests at pgs. 2-3 and the outstanding discovery requests and Defendants' responses.

**1.      Defendants unilaterally refuse to produce anything it considers not related to its safe harbor defense.**

This issue is related to RFP. Nos. 1, 6, 8-31, 34-36, 38-48, 51, 60-62, 64, 66-67, 72, 75, 77, 80-81, 84, 90-92, 99, 110 and 113.  Plaintiffs do not agree to Defendants' unilateral bifurcation of this case. Plaintiffs are seeking to hold Defendants secondarily liable for copyright infringement and violations of integrity of copyright management information ("DMCA violations") per 17 U.S.C. §1202 by users of its service.  The safe harbor provided by 17 U.S.C. §512(a) which Defendants plead as one of their affirmative defenses only limits monetary liability for *copyright infringement*.  Indeed, §1202 has its own safe harbor in subsection (e) which Defendants do not plead.  Accordingly, even if this case was bifurcated, a successful §512(a) safe harbor defense would *not* be case dispositive because the DMCA violations count would remain.  Moreover, a successful §512(a) safe harbor defense would not even dispose of the copyright infringement claim

Page 2

because §512(a) only limits monetary damages (not all liability). Plaintiffs are also seeking injunctive relief (piracy website blocking order). Therefore, if this case is bifurcated, there will be two rounds of summary judgment motions. The Court should order Defendants to fully respond to all discovery.

**2.       Defendants refuse to disclose any evidence prior to 7/2018.**

This issue is related to RFP Nos. 1, 8-21, 23, 25-30, 33, 38-68, 72, 75-77, 79-86, 90-92, 94-103, 105-107, 109-111, 113 and 114 and Interrogatory Nos. 1-8 and 10. Although this case was filed July of 2021, the discovery rule permits Plaintiffs to seek damages based upon pre-7/2018 infringements (from at least early 2015) and DMCA violations because Plaintiffs did not discover Defendants' liability until 2020. There is a public record supporting this fact. On April 4, 2019, some of the Plaintiffs filed lawsuits against the operator of the piracy website YTS, among other defendants, in the District of Hawaii (Case Nos. 1:19-cv-00169-LEK-KJM, 1:19-cv-389-ACK-KJM and 1:19-cv-1:19-cv-413-SOM-KJM). Between December 27, 2019 and April 14, 2020, the Hawaii District Court entered stipulated judgments against the YTS website operator to resolve the lawsuits. In 2020, the YTS website operator provided account information on its registered users included the email address the users used to register for an account, the torrent files for pirating Plaintiffs' Works downloaded, and the IP addresses from where the registered users downloaded the torrent files. *See* Doc. #22-3. Next, Plaintiffs' counsel obtained data from PML concerning notices sent to Defendant and from MEU concerning capture records of infringement of their movies to confirm the data provided by the YTS website operator[1]. *See* Doc. #22 at ¶¶113-116. This combined information conclusively showed Defendants' liability. Shortly thereafter, on Oct. 19, 2020, Plaintiffs' counsel sent a demand letter to Defendants to attempt to resolve the issue amicably. *See* Doc. #22-4. Accordingly, it would not have been possible for Plaintiffs to know that Defendants allowed their service to be a hot bed for piracy until they received the information from the YTS website operator, the notice data from PML and the capture data from MEU. Because the discovery rule applies, the Court should order Defendants to fully produce documents responsive to requests for pre-2018 documents.

**3.       The IP address lease log dispute.**

This issue is related to RFP Nos. 35-37 and 85. Defendants assign IP addresses to their customers for a limited period of time referred to as the lease log. Plaintiffs have evidence that their movies were widely pirated from the same IP addresses over extended time periods. The lease logs prove that the same subscriber accounts were responsible for this conduct and that Defendants failed to timely take appropriate actions. Defendants contend that they offered

---

[1] The portion of the First Amended Complaint unartfully stating Plaintiffs engaged MEU is being corrected in the proposed Second Amended Complaint [Doc. #51-1]. MEU was hired by an agent of Plaintiffs and has no direct contractual relationship with Plaintiffs.

Page 3

Plaintiffs a compromise of a certain number of IP addresses.  But Defendants reneged on the earlier understanding to agree to a stipulation for a cable act authorization[2] for disclosures of subscriber identifications for up to 125 IP addresses[3].  Accordingly, Plaintiffs request the lease logs for all the IP addresses in Exhibit "2" of the Second Request for Production of Documents.

**4.      Defendants' discussions of prominent ISP copyright lawsuits disputes are relevant.**

This issue is related to RFP Nos. 73, 74 and 112-113.   Defendants' internal communications about other ISP copyright lawsuits is relevant for rebutting Defendants' safe harbor defense. In other ISP lawsuits, Courts have viewed internal emails as circumstantial evidence that an ISP has failed to reasonably implement a DMCA safe harbor policy.  For example, in *UMG Recordings, Inc. v. Grande Communs. Networks, LLC*, 384 F. Supp. 3d 743, 755 (W.D. Tex. 2019) ("*Grande I*") in which Defendants' counsel is also counsel for Defendants' sibling company Grande, the Court cited internal emails from Grande discussing other ISP lawsuits in the order denying a safe harbor.  Defendants' internal communications about *BMG Rights Mgmt. (US) LLC v. Cox Communs., Inc.*, 881 F.3d 293, 301 (4th Cir. 2018) will show that Defendants knew that Courts repeatedly rejected their arguments that notices needed to include verifiably information before an ISP was required to act.  Moreover, limited documents provided so far in discovery show that Defendants have engaged in some of the same conduct that was criticized in *Cox* and *Grande I* such as refusing to terminate any subscribers for any reasons and using hyper technical excuses to reject notices.  Defendants' communications about other ISP lawsuits will show that their conduct was willful.

Defendants' internal communications about other ISP lawsuits is also relevant for rebutting Defendants' failure to mitigate damages defense.  *See* Answer [Doc. #40] at p. 23, ¶3.  Particularly, Defendants' own comments on other ISP lawsuits will show evidence of the impracticalities of suing every direct infringer and how lawsuits such as this one against an ISP are more effective in persuading an ISP to change its policies or combatting online piracy.

**5.      Defendants' network monitoring practices are highly relevant.**

This issue is related to RFP Nos. 13-24 and 90.  Each of the §512(a)-(d) safe harbors has specific technical requirements. For example, the §512(a)(1)-(5) safe harbor requires the service provider to satisfy five technical requirements pertaining to how material is transmitted through the system to recipient. Further, §512(i)(B) includes a requirement that the service provider accommodate and not interfere with standard technical measures used by copyright owners to protect copyrighted works. Evidence of Defendants' network monitoring is relevant to proving

---

[2] 47 U.S. Code § 551(c)(2)(B) (The "Cable Act") prevents Defendants from disclosing subscriber identification without a court order if Defendants are a cable company.

[3] The Court can see from the Parties' protective order [Doc. #44] that the parties had basically agreed to stipulate to a cable act authorization.  Section II, 2, (b)(i) provides for protection of subscribers' identification information.

Page 4

that they do not satisfy the strict technical requirements of §512(a)(1)-(5) or the other §512(a)-(d) safe harbors and that it has the capability for monitoring subscribers' activities.  In other ISP lawsuits, Courts have found Defendant's network monitoring techniques to be relevant. *See Sony Music Entm't v. Cox Communs.*, Inc., No. 1:18-cv-950-LO-JFA, 2019 WL 13298945, 2019 U.S. Dist. LEXIS 231858, at *8 (E.D. Va. Nov. 19, 2019) (finding that P2P traffic is relevant to the ISP's business mode, finance incentives and knowledge of potentially infringing activity).

**6.      Defendants' refusal to disclose evidence of profit from pirating customers.**

This issue is related to RFP Nos. 24-30, 47, 75-76 and 81.  Defendants have refused to disclose evidence of their profit from customers' piracy such as profit margins, charge for services, and gross revenues.  17 U.S.C. §504(b) provides that Plaintiffs are entitled to any of Defendant's profits that are attributable to the infringement.  Accordingly, evidence of Defendant's revenue from pirating subscribers, lifetime customer values and internal valuations are relevant for establishing infringer's profits per §504(b) and rebutting arguments Defendants appears to intend to make about practices they adopted during the COVID-19 pandemic.   Should Plaintiffs elect statutory damages per§504(c), Defendants' profits and gross revenue from pirating customers is relevant for determining the appropriate range of statutory damages.

Plaintiffs requested information on Defendants' profits from the pirating customers and Defendants' policies for termination of accounts for nonpayment.  In other ISP lawsuits such as *Cox*, the Court evaluated the reasonableness of the policy by comparing terminations for DMCA violations to terminations for non-payment. *See Cox*, 149 F. Supp. 3d at 659 (E.D. Va. 2015) ("Cox also admits that of the 22 terminated accounts, 17 of those had also either failed to pay their bills…"). Defendants' profit and revenue from pirating customers is relevant to establish their motive for failing to terminate repeat infringers and rebut Defendants' bogus First Amendment argument. Defendants did not terminate certain customers for which Defendants received hundreds of notices of ongoing infringement. Defendants' gross revenue and profits from these pirating subscribers are important for showing Defendants' motive for failing to terminate these customers. This is particularly the case here because Defendants argue that the notices were "non-compliant" based upon hyper technical reasons.

**7.      Defendants refuse to disclose information showing their relationship within Astound such as common officers and managers despite RCN rebranding itself as Astound.**

This issue is related to RFP Nos. 2-4.  Information about the individuals within Astound that control Defendants' policies and practices is relevant for evaluating whether other entities within Astound should be joined as Defendants and which individuals Plaintiffs should seek deposition testimony.  Plaintiffs note that in *Grande I* Defendants' sibling company Grande argued that its financial strength to pay the $46,000,000 jury verdict should be measured by not just itself but the entire Astound group collectively.  *See Grande I*, Mar. 9, 2023, Decl. of John Feehan, Doc.

Page 5

#502-3 at ¶3.  Documents turned over by Defendants so far in discovery show that the same key people responsible for Defendants' purported DMCA policy are also responsible for other Astound group companies for which Plaintiffs have similar evidence of massive piracy of their movies. Evidence admitted in the *Grande I* trial showed there were internal communications between RCN and Grande about the *BMG. v. Cox* decision and whether they should meet with a notice provider concerning their subscribers' piracy.  *See Grande I*, Doc. #470 at p. 95 (discussing 8/23/2016 email of Mr. Fogle of Grande to Mr. David of RCN concerning *BMG. v. Cox* decision) and pp. 113-119 (discussing 2/18/2016 email from Deborah Rankin of RCN to Mr. Rohre of Grande concerning letters from notice provider Rightscorp).  Evidence that the same individuals who orchestrated Defendant's policies for creating a hotbed for piracy also did same for other entities within the Astound group such as RCN is relevant for showing Defendants' knowledge of the ongoing piracy, Defendants' willful blindness, that their purported DMCA repeat infringer policy is a sham and the willful nature of Defendants' contribution to infringements of Plaintiffs' movies.

**8.      Defendants fail to disclose the custodian of records.**

This issue is related to RFP Nos. 1, 5-20, 22-31, 33-34, 38-41, 43-49, 51-63, 65-68, 72, 74, 76, 77, 80-81, 84-85 and 88.  Plaintiffs' instructions Nos. 14 and 19 in the First and Second Request for Production of Documents state, "For each discovery request or part thereof to which you object on the ground of burdensomeness, please indicate the custodian and location of each file or document requested, and the time estimated to obtain the information."  Defendants objected based upon burden to numerous RFPs but failed to identify any custodian(s), locations and estimate time for these documents.

**9.      *UMG* case documents are relevant.**

This issue is related to RFP No. 1.  Documents Defendants produced in the ongoing case of *UMG Recordings, Inc. et al. v. RCN Telecom Services, LLC et al.*, 3:19-cv-17272-MAS-ZNQ, D.N.J. are highly relevant.  Both cases relate to the exact same issue – users of Defendant's service engaged in widespread piracy with Defendants' knowledge.  Because Plaintiffs assert the discovery rule, there is also an overlapping claim period.  But even without the discovery rule, there still is an overlapping period of over a year.

**10.     Defendants' disparate practices between other policies that benefit it and its DMCA policy.**

This issue is relevant to RFP Nos. 31, 81, 88 and 91-92.  The key issue in this case is whether Defendants reasonably *implemented* a DMCA policy for terminating repeat infringers consistent with 17 U.S.C. §512(i)(A) sufficient for limiting monetary damages.  Defendants assert in their Answer that they have been terminating subscribers per a DMCA policy.  However, evidence that Defendants immediately terminate subscribers for non-payment while putting off terminating subscribers that repeatedly infringe Plaintiffs' Works is circumstantial evidence that

Page 6

Defendants have not reasonably implemented a DMCA policy.  Moreover, this evidence is relevant to confirm whether some subscribers Defendants assert they terminated per a DMCA policy were in fact terminated for non-payment.  Plaintiffs note that the Court in *Grande I* concluded that this type of evidence was admissible at trial.  *See Grande I*, April 8, 2020 Order, Doc. #347, p. 16. Further, this evidence will be necessary to rebut an argument that Defendants appear ready to make about the COVID pandemic and a First Amendment right to Internet service.  Defendants cannot have it both ways by arguing that they did not want to terminate subscribers out of concern of COVID-19 or the First Amendment when they were promptly terminating subscribers for non-payment.

Similarly, evidence of contradictory practices such as that Defendants take aggressive action when businesses pirate live sports for which they have exclusive rights or when their subscribers infringe movies of film studios or distributors for which Defendants have negotiated specific agreements to profit is relevant circumstantial evidence showing that their DMCA policy is a sham.  The Plaintiffs in *Grande I* were permitted to present evidence of Defendants' aggressive efforts to stop customers from streaming live sports in violation of their exclusive rights.  *See Grande I*, Doc.# 468 at p. 132.  This contradicts Defendants' argument that they did not act because they could not verify the piracy in the notices.

**11.     Privilege Log/Failure to timely produce.**

The Court noted in the hearing its position that a privilege log can be disclosed later in the case since Defendants are making productions on a rolling basis.  Plaintiffs point out that they have not received documents that are substantive on most of the RFP topics except 88 and 93.  While Plaintiffs described Defendants May 24 production as "substantial" on June 26, *see* Doc. #59, after reviewing it turns out that this production was substantial in number but not quality.  Basically, Defendant's production included over 3000 internal ticket action text files that only include internal DMCA and ticket numbers and do not include an IP address.  There is absolutely no feasible way to associate these tickets with IP addresses where Plaintiffs' movies were pirated. Regarding RFP No. 8, Defendants deny that the principal address and state of incorporation of RCN Telcom service of Mass are as alleged in the complaint but have not turned over any documents showing Defendant RCN Mass's state of incorporation and address.  In RFP No. 108 Plaintiffs requested documents saying Plaintiffs' counsel's name (Kerry Culpepper) for a short period prior to the case filing (for one month in March and April), Defendants refuse to produce these documents and have not even produced a privilege log.  In their response to interrogatory No. 4, Defendant refuses to identify the quotas or restrictions on the number of notices they will act on and the reasons or bases for these limits.

Page 7

<u>Plaintiffs request permission to send an unredacted version of Defendants' answers to the first interrogatories to the Court's chambers so that the Court can consider Defendants' confidential answers and whether these answers are truly confidential.</u>

**12.     The Cable Act dispute.**

The Parties have already submitted letters on the Plaintiffs' request for a Court order authorizing Defendants to disclose subscriber identifications pursuant to 47 U.S. Code § 551(c)(2)(B) (The "Cable Act").

Sincerely,

/ksc/

Kerry S. Culpepper

kculpepper@culpepperip.com

/Michael Cukor/

Michael Cukor

McGeary Cukor LLC

mcukor@mcgearycukor.com